Chauncey L. MOORE, Jr., et al., Plaintiffs-Appellants,

v.

The MARKETPLACE RESTAURANT, INC., et al., Defendants-Appellees.

No. 83–2511.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1984.

Decided Jan. 29, 1985.

As Amended Feb. 11, 1985.

Coffey and Posner, Circuit Judges, each filed opinion.

Floyd R. Gibson, Senior Circuit Judge, concurred in part, dissented in part, and filed opinion.

Eugene Lieberman, Wilmette, Ill., for plaintiffs-appellants.

William C. Barasha, Kurnik & Cipolla, Arlington Heights, Ill., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.*

COFFEY, Circuit Judge.

■ In 1980, the plaintiffs Chauncey L. Moore, Jr., Hugo P. Kosmel, Jr., Judith M. Kosmel, Arthur J. Ciolkowski, Andrea R. Ciolkowski, and Kimberlee Kosmel filed this action in the United States District Court for the Northern District of Illinois

---

* The Honorable Floyd R. Gibson, United States Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

under 42 U.S.C. § 1983,[1] against The Marketplace Restaurant, Inc., Walter E. Schneiter, John H. Schelley, James A. Bakular, Eric C. Egger, John Moss, and the County of Will, Illinois, alleging violations of the plaintiffs' Fourth, Eighth, and Fourteenth Amendment rights resulting from an alleged unlawful arrest and subsequent imprisonment.[2] The plaintiffs' original complaint contained four counts. The first count alleges that the defendants unlawfully arrested and detained the plaintiffs. Count II alleges that while making the arrest, the defendants wrongfully abandoned Kimberlee Kosmel, a minor. Count III alleges that the detention described above was of such a quality and nature as to violate the plaintiffs' constitutional rights.[3] Finally, Count IV asserted certain state law violations against Mr. Schneiter for malicious prosecution.

Upon defendants' motion for summary judgment, the district court initially dismissed all counts except for the unlawful arrest claim. It based this holding on the decision in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) which held that warrantless, nonconsensual entry to effectuate an arrest was unlawful under the Fourth Amendment. However, on the defendants' Motion for Reconsideration, the district court determined that the plaintiffs consented to the entry since they opened their doors after the police had identified themselves and granted summary judgment in favor of the defendants on all claims set forth in the complaint.

The plaintiffs now appeal the district court's decision granting summary judgment for the defendants and dismissing their claims contending that material issues of fact exist concerning the alleged illegality of the plaintiffs' arrest and subsequent detention. Upon review of the facts set forth in the pleadings, affidavits and interrogatories filed in this case, we are guided by the following standard in our review of the district court's order granting summary judgment:

"It is well accepted that the purpose of summary judgment is to prevent an unnecessary trial where, on the basis of the pleadings and supporting documents, there remains no material issue of fact to be tried. *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 559 (7th Cir.1970). Summary judgment is appropriate only if it appears that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976); Fed.R.Civ.P. 56(c). The burden is upon the moving party to show that there is no issue of material fact in dispute, *Rose v. Bridgeport Brass Co.*, 487 F.2d 804, 808 (7th Cir.1973), and all doubts as to the existence of an issue of material fact must be resolved against movant. *Moutoux v. Gulling Auto Electric, Inc.*, 295 F.2d 573, 577 (7th Cir.1961)."

*Dreher v. Sielaff*, 636 F.2d 1141, 1143 n. 4 (7th Cir.1980). Applying this standard to the instant case, we hold that there exist genuine issues of material fact as to the issues of probable cause and pretrial de-

---

1. 42 U.S.C. § 1983 provides:
   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit and equity, or other proper proceeding for redress."
   Thus, in order to recover under this provision, the plaintiff must establish two things: a deprivation of a right secured by federal law or the Constitution and an action by the defendant under the color of state law. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

2. This court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1988.

3. Besides alleging that the unlawful detention violated the plaintiffs' Eighth and Fourteenth Amendment rights, the plaintiffs also alleged that the manner of detention violated Ill.Rev. Stat., ch. 38, § 103–3 which requires the defendants to permit the plaintiffs to call their lawyers, and ch. 75 § 11 which requires that male and female prisoners be segregated.

tainment; thus we remand this case to the district court for a proper determination of these factual issues.

## I.

The record, as developed in this case, discloses that on Friday, April 28, 1979, at approximately 8:30 p.m., the plaintiffs arrived at The Marketplace Restaurant near Joliet, Illinois. On that particular day, the plaintiffs were attending the meet trials of the Western Irish Setters Club at the Des Plaines Conservation Area. The plaintiffs' affidavits state that after arriving at the restaurant and ordering their food and drinks, forty-five minutes had lapsed before they were served their soups and salads. Upon asking the manager, the defendant Mr. Schneiter, when the meals would be served, he allegedly responded with a profane remark. One hour to one and one-half hours later, between 9:30 p.m. and 10:00 p.m., the plaintiffs again asked when their meals would be ready. The request for service continued until 10:30 p.m. when the defendant allegedly once again responded profanely. · At this point the plaintiffs got up to leave. Both Judy Kosmel and Andrea Ciolkowski recited that they each offered to pay for the soups, salads and drinks consumed during the two-hour period. The defendant allegedly responded in an angry tone demanding that the plaintiffs pay for the entire meal. To support his demand, the defendant allegedly told the plaintiffs that he would get his money and take care of them in his "own way" if they refused to pay for the entire meal.

In his affidavit in support of the motion for summary judgment brought on behalf of the Will County defendants, defendant deputy sheriff John Moss testified that at approximately 10:45 p.m. on the evening of April 28, 1979, he received a radio call from the dispatcher at the sheriff's office advising him to proceed to the Marketplace Restaurant. Upon arriving, he was advised by Mr. Schneiter, the manager, that five persons, three men and two women, had entered the restaurant at approximately 8:30 p.m. that evening, that each had ordered meals and consumed several drinks with either a salad or a bowl of soup, and that they had left without paying or offering to pay for the food and beverages they ordered and consumed. Deputy Moss further testified that Mr. Schneiter gave him a physical description of each of the five persons and provided him with descriptions of their vehicles. He was also told that the five individuals were not from the area and they would be camping overnight at the camping area in the Des Plaines Conservation Area. The deputy further stated that he spoke with the waitress who had waited on the plaintiffs' table and that she had stated that the plaintiffs had consumed salads, soups and drinks, and that none of the plaintiffs had paid or offered to pay her for the drinks and food. According to the deputy, Mr. Schneiter then agreed to sign a criminal complaint against the plaintiffs on the following Monday morning. After receiving this information, the deputy testified that he called the shift sergeant at the Will County Sheriff's Police Department and relayed the information to the sergeant who then instructed him to arrest the plaintiffs for the crime of theft of services.

Deputy Moss, along with Deputies Bakular and Egger, proceeded to the campgrounds, located the vehicles matching the descriptions given to Deputy Moss by Mr. Schneiter, and knocked on the doors of the three campers where the plaintiffs were sleeping. In response to queries by the plaintiffs in each of the campers as to who was at the door, the deputies identified themselves as the police. When the doors to the campers were opened, the officers entered the campers, asked the plaintiffs whether they had been at The Marketplace Restaurant that night, and upon receiving an affirmative answer, placed each adult plaintiff under arrest, handcuffed them and took them to the waiting squad cars. Judith Kosmel advised the officer that her fifteen-year-old daughter was in the camper alone. The officer gave her the choice of either having the daughter accompany them and letting her sit in the squad car while they were in custody or having her

remain in the camper alone. Judith Kosmel told the officer that the child could not be alone and that either choice was unacceptable; however, she eventually decided to leave her daughter in the camper. It was established that the camper did have locks and heat. The minor child, Kimberlee Kosmel, suffered no physical injury; however, she claimed damages for emotional distress as a result of witnessing the arrest and handcuffing of her parents and being left alone in the camper without protection. Upon being transported to the jail, Judith Kosmel stated in her deposition that one of the deputies told her that the situation should never have happened and if it was the officer in the plaintiffs' shoes, he would sue.

Upon arriving at the jail, the plaintiffs were all placed in the same holding cell.[4] A burly drunk was also placed in the holding cell. The drunk apparently screamed threats and profanities at the deputies and glowered and muttered at the plaintiffs. The time spent by the plaintiffs in this holding cell is unclear from the record; however, it appears that they spent a minimum of four hours in detention prior to their release early the following morning. Upon their release, the plaintiffs were not offered a ride back to the campgrounds and thus apparently were forced to hitch-hike back.

A complaint was issued the following Tuesday with Mr. Schneiter as the complainant; however, the charges were subsequently dismissed by the trial court. Following dismissal of the criminal complaint, the plaintiffs filed this 1983 action in federal district court. In response the defendants filed a motion for summary judgment and attached affidavits in which Schneiter claimed that he had no prior contact with the Will County Sheriffs regarding any other incidents at his restaurant, while deputy sheriff John Moss also stated that he did not have any previous contacts with the restaurant or Mr. Schneiter. After reviewing the evidence and the applicable law, the district court granted the defendants' motion for summary judgment on all claims as to each defendant named. We now turn to the merits of this case and address each of the plaintiffs' claims against the defendants.

## II.

### A. Claims against deputies for unlawful arrest in violation of Fourth Amendment.

The plaintiffs' complaint alleged violations of their Fourth Amendment rights arising from both the warrantless entry into their campers and the lack of probable cause to arrest. We first address the illegal entry claim.

Since the *Payton v. New York*[5] decision, any warrantless entry into a house to effectuate an arrest, absent exigent circumstances, has been considered to be a violation of the Fourth Amendment of the United States Constitution. Citing the *Payton* decision, the district court initially held this case over for trial on the issue of whether there was an illegal entry by the sheriffs. In a later order, the district court changed its mind, citing *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976), and held as a matter of law that because the plaintiffs opened the door in response to the deputies identifying themselves, they consented to the deputies' entry. Based upon the facts presented from the parties' motions and affidavits in support of summary judgment, we are not convinced that the plaintiffs consented to the deputies' entry; however, we initially address the issue of whether the officers are immune from liability, as a matter of law, for their warrantless entry.

---

**4.** The plaintiffs' complaint also alleges that they were denied access to a lawyer and that the holding cell lacked toilet facilities. However, at the subsequent depositions, the plaintiffs admitted that they never requested to see a lawyer and that the deputies did respond to their requests to use bathroom facilities, although somewhat belatedly.

**5.** 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

Even though an officer may be exposed to damages arising from a § 1983 violation, he or she will not be held liable where the law at the time of the arrest was unsettled. In this case, the plaintiffs were arrested after the warrantless entry into their camper. This arrest, however, took place prior to the *Payton* decision which established that warrantless entry into a home absent exigent circumstances was unconstitutional. Prior to the *Payton* decision, the Supreme Court had not resolved the issue of "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." *United States v. Watson*, 423 U.S. 411, 418 n. 6, 96 S.Ct. 820, 825 n. 6, 46 L.Ed.2d 598 (1976).

At the time of the plaintiff's arrest, the literal terms of the Illinois statute governing the manner of arrest apparently gave *carte blanche* authority for police officers with probable cause to arrest to enter without a warrant. *See* Ill.Rev.Stat. ch. 38, §§ 107–2, 107–5(d) (1971) *cited in Payton*, 445 U.S. at 598 n. 46, 100 S.Ct. at 1386 n. 46. However, prior to the *Payton* decision, the Illinois appellate courts did recognize that the constitutionality of warrantless en-

tries absent exigent circumstances was open to question. *See People v. Wolgemuth*, 69 Ill.2d 154, 13 Ill.Dec. 40, 370 N.E.2d 1067 (1977), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2243, 56 L.Ed.2d 408, *cited in Payton*, 445 U.S. at 599 n. 46, 100 S.Ct. at 1386 n. 46. An examination of the Illinois appellate decisions near the time of the plaintiffs' arrest demonstrate this uncertainty. For example, in *People v. Wolgemuth*, 43 Ill.App.3d 335, 1 Ill.Dec. 857, 356 N.E.2d 1139 (1976), an Illinois appellate court held that warrantless entry into a home to make an arrest absent exigent circumstances violated the Fourth Amendment. This decision was reversed on other grounds by the Illinois Supreme Court. *People v. Wolgemuth*, 69 Ill.2d 154, 13 Ill. Dec. 40, 370 N.E.2d 1067 (1977). Other decisions during this period noted that the lawfulness of a warrantless entry must be determined on a case-by-case basis. *See e.g., People v. Bean*, 73 Ill.App.3d 918, 29 Ill.Dec. 953, 392 N.E.2d 650 (1979); *People v. Logan*, 78 Ill.App.3d 646, 34 Ill.Dec. 48, 397 N.E.2d 504 (1979).[6]

In *Foster v. Zeeko*, 540 F.2d 1310 (7th Cir.1976),[7] we stated " '[t]he fate of an

---

**6.** Although in this case the police entered to effectuate an arrest for an alleged misdemeanor and not a felony, in deciding whether the entry was constitutional or not, the severity of the crime was not the determinative factor under Illinois law at the time of the plaintiffs' arrest. Ill.Rev.Stat. ch. 38 § 107–2 states that:

"A peace officer may arrest a person when:
\* \* \* \* \* \*
(c) He has reasonable grounds to believe that the person is committing or has committed the offense."

Illinois decisions interpreting the arrest statute have held that the term "offense" includes arrests for both misdemeanors and felonies. *See e.g., Wilson v. Hunk*, 51 Ill.App.3d 1030, 10 Ill. Dec. 90, 367 N.E.2d 478 (1977). Thus, Illinois did not adopt the common law rule that in order to arrest for a misdemeanor the offense must have been committed in the presence of an officer.

Illinois Rev.Stat. ch. 38 § 107–5(d) defines the manner by which an authorized arrest may be accomplished:

"All necessary and reasonable force may be used to affect an entry into any building or property or part thereof to make an authorized arrest."

Warrantless entry to make an arrest absent exigent circumstances at the time of the plaintiffs' arrest was developing on a "case-by-case" basis. Thus, we can only at best speculate whether the entry for a misdemeanor arrest not committed in the presence of the officers would have been held to be unconstitutional or not by an Illinois appellate court. In *People v. Abney*, 81 Ill.2d 159, 41 Ill.Dec. 45, 407 N.E.2d 543 (1980), the Illinois Supreme Court construed the Illinois arrest statutes as consistent with the *Payton* decision. The *Abney* decision, however, was rendered over one year after the arrest in this case took place.

We note in passing that the United States Supreme Court recently considered the scope of the exigent circumstance exception when there is a warrantless entry to make an arrest for a minor infraction, the Court found that entry in such circumstances will rarely be justified. *Welsh v. Wisconsin*, — U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

**7.** In this case, a Chicago police officer made an arrest pursuant to a Chicago ordinance. The trial court subsequently dismissed the complaint. The plaintiff who was arrested then brought suit under 42 U.S.C. § 1983 and after both sides filed motions for summary judgment

official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial.' ... While it is true that we are here more concerned with the objective than the subjective state of mind of the defendants, we are of the opinion that the general rule of inappropriateness of summary judgment in actions involving state of mind, ... is not without applicability here." *Id.* at 1319 (citations omitted). The Supreme Court, however, recently addressed the issue of qualified immunity of officials who violate constitutional protections and eliminated the subjective good faith element previously referred to as the second-prong of the "good faith" defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[8] The Supreme Court went on to state:

> "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal

developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* at 818, 102 S.Ct. at 2739. The Supreme Court spoke exclusively in terms of "clearly established" law. This suggests that an official may escape liability for acts which could possibly be considered to violate a constitutional right if the right violated was not clearly established.

■ In this case, the arrest of the plaintiffs was prior to the Supreme Court decision in *Payton* declaring that warrantless entry into a dwelling to effectuate an arrest absent exigent circumstances was unconstitutional. The state of the law in Illinois prior to the *Payton* decision was unclear. The Illinois statutes clearly provided for warrantless entry; however, the Illinois appellate courts were far less cavalier in approving of such entry. Since the state of the law regarding warrantless entry was far from "clearly established" in Illinois at the time of the plaintiffs' arrest let alone under the United States Constitution, we hold that under the dictates of the Supreme Court's decision in *Harlow* the dismissal of the plaintiffs' claim in regard to the warrantless entry was proper. Since it was proper for the district court to dismiss this portion of plaintiff's claim, we do not reach the consent issue insofar as consent relates to the Fourth Amendment warrantless entry cause of action.[9]

and agreed that there was no issue of material fact, the district court declared the ordinance under which the plaintiffs were arrested unconstitutional. The court then ordered summary judgment to the plaintiffs on the issue of liability. The district court believed that as a matter of law the defendant police officers could not have reasonably believed that they could constitutionally arrest the plaintiffs under the ordinance in question since a similar ordinance was declared unconstitutional prior to the arrest of the plaintiffs. This court reversed and remanded for trial after reviewing the state of the law at the time of the arrest and determining that there was enough legal uncertainty surrounding the constitutionality of the ordinance that the grant of summary judgment for the plaintiffs was improper.

8. Prior to the *Harlow* decision, the two-prong "good faith" defense consisted of both an objective and subjective test. If either standard was

violated, the defendant's immunity defense would not be available. Under the objective test, qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]," while under the subjective test, "if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury ..." immunity would not be available. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2737, *quoting Wood v. Strickland*, 420 U.S. 308, 321–322, 95 S.Ct. 992, 1000–1001, 43 L.Ed.2d 214 (1975).

9. As noted in the introduction to this opinion, the district court decided that whatever the merits were to the argument that the warrantless entry was unconstitutional, the plaintiffs consented and thus waived this constitutional protection. While we do not reach the consent

Despite the fact that the warrantless entry into the camper does not give rise to a § 1983 claim in this case, this does not end our inquiry as to whether an issue of fact exists regarding the Fourth Amendment violation. Relying on the "citizen informant" rule, the district court determined that the deputy sheriffs had sufficient probable cause to arrest the plaintiffs for theft of services under Ill.Rev.Stat., ch. 38, § 16A–1 (1979). Citing *United States v. Rowell,* 612 F.2d 1176 (7th Cir.1980), the district court determined that the information provided by Mr. Schneiter and the waitress was sufficient under the citizen informant rule to establish the existence of probable cause. Although not clearly addressed in their briefs, the plaintiffs apparently contend that issues of fact remain as to the presence of probable cause to arrest under the facts of this case. They assert that the officers' own good faith belief as to whether probable cause existed is at issue since one of the officers allegedly told Mrs. Kosmel on the way to the jail that she should consider suing because of the circumstances of their arrest.

Previous to *Harlow,* the test for the existence of a § 1983 violation was " 'not whether the arrest was constitutional or unconstitutional or whether it was made with or without probable cause, but whether the officer believed in good faith that the arrest was made with probable cause and whether that belief was reasonable.' *Brubaker v. King,* 505 F.2d 534, 536–37 (7th Cir.1974)." *Lenard v. Argento,* 699 F.2d 874, 884 (7th Cir.1983). Thus, under this formulation the plaintiffs have a legitimate point as to whether an issue of fact exists as to the officer's good faith in making the arrest. However, as pointed out earlier, the United States Supreme Court has eliminated the subjective good faith prong. *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738. If probable cause does not exist and, therefore does not act as a bar to the plaintiffs' action,[10] the test for immunity is whether the police officer " 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff] ....' " *Id.* at 815, 102 S.Ct. at 2737.

The district court relied on, and the defendant now cites to us, cases standing for the proposition that information supplied by citizens regarding an alleged crime is enough to furnish probable cause to ar-

issue for purposes of the Fourth Amendment unlawful entry claim, we disagree with the district court's conclusion that as a matter of law the plaintiffs consented to the deputy sheriff's entry. The district court cited *United States v. Griffin,* 530 F.2d 739 (7th Cir.1976) to support its finding that the plaintiffs consented to the search. However, the key element in that decision establishing that the person had consented was that the police knocked on the door, identified themselves, and stated their purpose. This statement of purpose, which was lacking in the present case, ensured that there was a clear absence of any misrepresentation on the part of the police in gaining entry. *See Griffin,* 530 F.2d at 743. Simply opening a door to identify a person is far different from granting permission to enter the premises. Whether it be a shanty, a camper, or a palace, "the Constitution extends special safeguards to the privacy of the home." *United States v. Orito,* 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973). Indeed, "a man's home is his castle." *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 66, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973). Thus, the United States Supreme Court has continued to recognize in decisions as recent as *Payton*

and *Welsh v. Wisconsin,* —— U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the importance of the home as a sanctuary. The legitimate objectives of law enforcement can also co-exist with these special protections as long as the police take the proper legal precautions in gaining entry. But, it is the court's role to guard this protected interest from abusive intrusions.

**10.** It has been held in this circuit that proof of the actual existence of probable cause is an absolute bar to the 1983 action irregardless of the lack of good faith of the arresting police officer. *See Terket v. Lund,* 623 F.2d 29 (7th Cir.1980). *See also Guenther v. Holmgreen,* 738 F.2d 879 (7th Cir.1984) where this court reiterated the rule from *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) that collateral estoppel may bar a 1983 action when a magistrate, in an earlier criminal proceeding, made an independent determination that probable cause existed to make the arrest. In this case a trial was commenced, but the charges were dismissed; the parties failed to show, and the record does not indicate, that any independent determination of probable cause was ever made.

rest.[11] These cases involved a felony forgery (*United States v. Rowell*, 612 F.2d 1176 (7th Cir.1980)); a suspect's flight from a scene of a violent felony (*United States ex rel. Burbank v. Warden, Ill. State Penitentiary*, 535 F.2d 361 (7th Cir.1976), *cert. denied sub nom.*, 429 U.S. 1045, 97 S.Ct. 750, 50 L.Ed.2d 758 (1977)); the sale of narcotics (*People v. Logan*, 78 Ill.App.3d 646, 34 Ill.Dec. 48, 397 N.E.2d 504 (1979)); a drug-related murder (*People v. Fisher*, 76 Ill.App.3d 331, 32 Ill.Dec. 107, 395 N.E.2d 54 (1979)); an armed robbery (*People v. Bean*, 73 Ill.App.3d 918, 29 Ill.Dec. 953, 392 N.E.2d 650 (1979)); and the possession of a concealed weapon (*People v. Mitchell*, 68 Ill.App.3d 370, 24 Ill.Dec. 949, 386 N.E.2d 153 (1979)). All of these cases involved serious crimes and felonies which required a swift response on the part of the investigating police officers. Ultimately, however, probable cause is determined not by the strictures of the citizen informant rule but by "the factual, practical considerations of everyday life upon which reasonable prudent men, not legal technicians act." *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95; *United States v. Ganter*, 436 F.2d 364 (7th Cir.1970); *See also Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Whether the arrest was valid depends upon "the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (explanation added). Thus, in cases such as this, the question revolves around the sufficiency of the information in the possession of the arresting officers and those that gave the command to arrest.

As evidenced by the affidavits and interrogatories in the record, this case essentially involves a dispute over the amount owed on a restaurant bill. It could almost be characterized as a dispute over whether a breach of contract occurred between the parties as to services and food to be provided. One party is dissatisfied with the service after not being served for two hours, while the other party insists upon performance for the services and the food ordered. One party insists that payment was offered for the consumed food, while the other insists that no offer of payment was made. Even considering that the deputies were privy to only one version of the story at the time they went to the campgrounds, apparently with their minds already made up to arrest the plaintiffs after orders from headquarters, it is clear that the parties involved were not fleeing from the scene, rather they were asleep in their campers at the time of the arrest. There was neither a threat to the officers' safety, nor a large amount of money involved in dispute, nor any serious crime committed. Yet, upon arriving at the campsite and determining, after asking the plaintiffs only one question—whether they were present in the restaurant on that particular night—the officers arrested, handcuffed, and conveyed the plaintiffs to the county jail. This entire episode may have been avoided if the officer who received the original complaint and the arresting officers had used reasonable judgment and conducted a proper investigation, inquiring both as to the plaintiffs'

**11.** In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the United States Supreme Court developed a test to determine whether probable cause exists when information relating to an alleged crime is supplied by an informant to a police officer. Under this test probable cause may exist based upon a tip by an informant where there is an adequate indication that the informant is reliable and the basis for the informant's conclusion is known. *Id.* at 114–15, 84 S.Ct. at 1514. If a citizen, rather than a police informant, supplies information to an officer, it is assumed that his reliability is established under *Aguilar's* first-prong. The second prong—the basis for the conclusion—is usually satisfied by the presence of the citizen on the scene of the alleged crime. We note that the United States Supreme Court recently modified the *Aguilar* test in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and now applies "totality of the circumstances" test. However, since the *Aguilar* test was used at the time of the arrest, we need not concern ourselves with the *Gates* modification.

presence in the restaurant and the dispute over the bill. Once explanations were provided, a further investigation could have been commenced in an attempt to resolve the dispute in a reasonable manner.

In *Roschen v. Ward,* 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722 (1929), a case construing a criminal statute, Mr. Justice Holmes stated, in language equally applicable to this situation, that "[w]e agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean." *Id.* at 339, 49 S.Ct. at 336. If we may be so bold as to paraphrase Justice Holmes' thought, "there is no law against using common sense"; indeed, the use of common sense is a prerequisite for police officers in developing their investigation in order to effectuate a valid arrest. In this land of freedom and liberty, with all of its concomitant constitutional rights and protections, if we wish to have our citizen population continue to respect the authority of police personnel performing their duties in a lawful manner, it is incumbent upon law enforcement officials to make a thorough investigation and exercise reason-able judgment before invoking the awesome power of arrest and detention.

Judge Posner, in his concurring opinion, argues that there are two jury questions present in this case, consent and probable cause. He seems to contend that the determination of probable cause is dependent upon the answer to the consent question. Our disagreement centers around the scope of the questions to be presented to the jury. This case has been litigated to date on the assumption that there were two alleged Fourth Amendment violations—the unlawful entry and the lack of probable cause to arrest. We have established, as a matter of law, that a cause of action does not arise under § 1983 for the deputies' warrantless entry into the plaintiffs' mobile campers since the law of warrantless entry was unsettled at the time of the alleged incident.[12] Therefore, unless he is urging alternative grounds for establishing liability, which he appears not to do since he ties the issue of consent to probable cause, a separate jury question on consent to enter is unnecessary since it implies that there may be an alternate theory upon which to impose liability other than the lack of probable cause to arrest.[13]

**12.** Judge Posner in his opinion disagrees with our conclusion that the deputies are immune from liability by citing dicta contained in *Coolidge v. New Hampshire,* 403 U.S. 443, 459–62, 91 S.Ct. 2022, 2034–36, 29 L.Ed.2d 564 (1971) (a case which invoked the plain view doctrine in an automobile search and, interestingly enough, was not relied upon by the majority in *Payton* when they clarified the warrantless entry issue). However, when determining whether "one could have reasonably believed that the police could without consent or a warrant enter a home to arrest a person on misdemeanor charges ..." (See Judge Posner's opinion) *Harlow* dictates that the reasonableness of the conduct is to be "measured by reference to clearly established law." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2739. As discussed earlier in this opinion, when we reviewed Illinois case law discussing the constitutional issues involved, the law clearly was not established in Illinois until the *Payton* decision, which was decided unfortunately for the plaintiffs, after the alleged incident in this case. We disagree with Judge Posner on this point, but he then finds, citing *People v. Carney,* 34 Cal.3d 597, 198 Cal.Rptr. 500, 668 P.2d 807 (1983), *cert. granted,* — U.S. —, 104 S.Ct. 1589, 80 L.Ed.2d 122 (1983), that the

law was and still is unsettled with respect to warrantless entry into a camper to arrest. Thus, if we are correctly characterizing his opinion, he would agree that the defendants are immune from liability so far as the claimed illegal entry into the camper. Thus, the issue then becomes whether the deputies had probable cause to arrest.

**13.** To assume that consent *to enter* is a jury question, one would have to assume the law was clearly established that one needs a warrant to enter; however, as I have pointed out after thorough research, the law was far from clearly established at the time of the incident in question. If one were to accept Judge Posner's position that a separate question concerning consent to enter is to be submitted to the jury, the consent question would not go to determining whether probable cause existed but rather would answer the question of whether there was a Fourth Amendment violation for entry without a warrant. In my opinion, this alleged Fourth Amendment violation is a separate and distinct issue from the alleged Fourth Amendment violation for arrest without probable cause.

This panel certainly agrees, however, that it cannot accept the district court's reliance upon the citizen informant rule and its conclusion, as a matter of law, that probable cause existed to arrest the plaintiffs. This case was dismissed on summary judgment; however, this court believes, under the circumstances, there remain questions of fact and it should have been left for the jury to decide the probable cause issue. *See e.g., B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7 (1st Cir. 1984); *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984); *Giordano v. Lee,* 434 F.2d 1227, 1230 (8th Cir.1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); *cf. Garris v. Rowland,* 678 F.2d 1264, 1270 (5th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982). Therefore, under the circumstances of this case it is proper for the jury to consider all the evidence, including questions regarding the sufficiency of the deputies' investigation at the scene, in determining whether there was enough evidence to establish probable cause to arrest for the crime of theft of services. Further, the jury may also consider the plaintiffs' statement that they were present at the restaurant only if the jury initially determines that those answers were not coerced. If the police officers did not have probable cause to arrest prior to their questioning the plaintiffs, the answers, if in response to an uninvited entry and harsh questions, cannot provide the probable cause. However, the jury can consider whether the answers to the sheriff's questions were coerced when it considers all the evidence in this case as it relates to probable cause. Contrary to Judge Posner's analysis in which he proposes that a separate jury question on the consent issue be presented, we hold a separate question need not be submitted. Rather, the jury should be instructed that if it finds the deputies did not have the required probable cause to arrest prior to the plaintiff's answers in the campers identifying themselves as the persons at the restau-

rant, the plaintiff's responses cannot support a finding of probable cause to arrest if, considering the circumstances of the entry and questioning, the jury is convinced those answers were coerced. Thus, we reverse and remand this issue for proceedings consistent with the directions contained herein.

This is not to suggest that the defendants in this case will now become liable for their actions. The jury may very well determine that probable cause existed to justify the arrest. Further, I believe, contrary to the position taken by my learned brethren on this panel, that submission of an immunity instruction is proper in this case. Although *Harlow* indicated that the issue of whether a constitutional right is clearly established is usually to be decided by the judge prior to trial (*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738), it did not state that this approach is etched in stone. Since *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), courts have traditionally submitted both probable cause and immunity questions to the jury. *See Bledsoe v. Garcia,* 742 F.2d 1237, 1239 (10th Cir.1984). Thus, if the probable cause question is to be submitted to the jury, as in this case, the question of whether there was in fact a constitutional violation will not be decided until the jury has determined whether or not probable cause existed at the time of arrest. If the jury should find that probable cause did not exist, then the question of immunity arises and should be presented to the jury concerning whether or not the police officer reasonably believed the actions taken were constitutional, even though the jury found that the technical requirements of probable cause were lacking to justify the arrest.[14] *See Bilbrey By Bilbrey v. Brown,* 738 F.2d 1462, 1466–67 (9th Cir.1984) (*citing Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972) enforcing 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),

---

**14.** I note that the probable cause determination made by the magistrate at a suppression hearing is far different from the probable cause determination to be made by the jury in a § 1983 action.

which explained that a distinction exists between the constitutional standards of probable cause and the officer's reasonable belief as to the validity of probable cause.[15] Following a similar rationale, *Bilbrey* harmonized the facial inconsistency in submitting an immunity question to the jury where the district court had found that probable cause, as a matter of law, did not exist); *see also B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7, 10–11 (1st Cir. 1984). *But see Trejo v. Perez,* 693 F.2d 482, 487–88 (5th Cir.1982). This approach is in accord with public policy considerations that while there may be a legitimate factual dispute over the existence of probable cause in a given situation, an officer will not be held liable unless his actions were unreasonable from a tort perspective. *Bivens,* 456 F.2d at 1349 (Lumbard, J., concurring). *Cf. Bledsoe v. Garcia,* 742 F.2d 1237 (10th Cir.1984).

The submission of instructions to the jury on the probable cause and immunity issues is consistent with the Supreme Court's admonition that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequence.' *Pierson v. Ray,* 386 U.S. 547, 554 [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967)." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739. Probable cause is a rather amorphous concept. It has frequently been noted, in the context of the criminal procedure Fourth Amendment cases, that reasonable men often disagree on whether probable cause exists in a given set of circumstances. Thus, since *Pierson v. Ray* the jury has been instructed on both the issues of probable cause (as it normally involves a question of fact) and immunity separately. However, in this case, if only the probable cause question is submitted to the jury, without the added protection of an immuni-

ty instruction, police officers may not only be exposed to unwarranted liability in the future but also there will be a concomitant "chilling effect" on actions that they take in good faith in pursuit of legitimate law enforcement objectives. Our courts must be sensitive to this fact. Thus, given the ever-expanding scope of § 1983 liability (*cf. Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), I believe consideration of submitting the immunity instruction to a jury of peers becomes that much more important.

Finally, I believe that the defendants should be allowed to attempt to establish an immunity defense prior to trial if they can demonstrate to the district court the second phase of the *Harlow* immunity analysis, i.e., that "extraordinary circumstances" existed and that they "neither knew or should have known of the relevant legal standard." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739. My concern centers around the circumstances of the arrest. The evidence discloses that at least one of the arresting officers was a volunteer. Also, in his affidavit, Deputy Sheriff John Moss testified that after receiving the information from the restaurant owner, he relayed it to his supervisor while en route to the campgrounds. He was subsequently instructed by his supervising officer to arrest the plaintiffs. Thus, it appears from the facts contained in this record that the decision to arrest was not made by the deputies, but rather was made by the shift sergeant in command who was removed from the scene and was unfortunately not specifically named as a defendant in this action. I believe that this may be one of those "extraordinary circumstances" referred to in *Harlow* and merits further consideration as far as the deputy sheriffs are concerned. This, of course, may not merit a grant of immunity prior to trial, in spite of the supervisor's order to arrest,

---

**15.** In formulating the probable cause and immunity instructions, "there are two standards to be considered. The first is what constitutes reasonableness for purposes of defining probable cause under the Fourth Amendment for the protection of citizens against government overreaching. The other standard is the less strident reasonable man standard of the tort action against government agents." *Bivens,* 456 F.2d 1348 (Lumbard J., concurring).

given the deputies' questionable inquiry and investigation at the scene. However, before this conclusion is reached, the procedures followed by the sheriff's department in situations similar to the present one and the amount of discretion if any given to deputy sheriffs to investigate after being ordered to arrest by a superior officer, in my opinion, require further inquiry.

## B. Conditions of detention giving rise to § 1983 action against the defendants.

█ A proper liberal reading of the plaintiffs' complaint demonstrates that it alleges violations of the Fourteenth Amendment [16] from the denial of the plaintiffs' request to call and meet with an attorney during their period of confinement pursuant to Ill.Rev.Stat., ch. 38, § 103–3; from the unnecessary delay in processing the plaintiffs' appearance in violation of Ill.Rev.Stat., ch. 38, § 109–1; from a failure to segregate inmates by sex in violation of Ill.Rev.Stat. ch. 75, § 11; [17] and from the failure of the sheriffs to prevent the verbal abuse inflicted by another detainee upon the plaintiffs.

In determining the validity of these claims, this court once again notes that an alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution. *Moore v. Kusper,* 465 F.2d 256, 258 (7th Cir.1972); *Street v. Surdyka,* 492 F.2d 368, 372–73 (4th Cir. 1974). Addressing the plaintiffs' claims individually, initially we hold that although

the plaintiffs have the right to call and consult with an attorney under the Fourteenth Amendment,[18] they have failed to state a claim since the evidence establishes that in fact they never did request the use of a telephone to call an attorney.[19]

█ Further, failure to segregate detainees by sex in the jail's holding cell, by itself, does not lead to a constitutional deprivation. This failure to separate by sex, however, led to the alleged abuse inflicted upon the plaintiffs by the burly drunk which, the women plaintiffs stated, led them to fear for their safety. The plaintiff cites *Stokes v. Delcambre,* 710 F.2d 1120 (5th Cir.1983) to support its position that this abuse establishes deprivation within the meaning of the Fourteenth Amendment. In *Stokes,* the plaintiff, who was charged with a misdemeanor, was left in a large cell area for days with persons who faced serious felony charges. During this time, he was savagely beaten by several inmates. The attention paid to the plaintiff's welfare by guards at the institution was, at best, negligible.

In the instant case, the evidence shows that the plaintiffs, including the females, were placed in a holding cell with a burly drunk who allegedly intermittently swore at the officers and, at times, glared and muttered at the plaintiffs. The women plaintiffs alleged in their depositions that they were frightened for their safety. We agree with the plaintiffs that a prisoner or, in this case, a detainee has the right to "be

---

16. This court will evaluate the legal sufficiency of the plaintiffs' allegations under the Fourteenth Amendment of the United States Constitution rather than the Eighth Amendment since the Fourteenth Amendment protects the rights of pretrial detainees. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872, n. 16, 60 L.Ed.2d 447 (1979); *see also Duran v. Elrod,* 542 F.2d 998 (7th Cir.1976).

17. This section has recently been renumbered as of July 1, 1984. *See* Ill.Ann.Stat. ch. 75 § 111 (Smith-Hurd 1984 Supp.)

18. *See* Committee Notes, Ill.Rev.Stat., ch. 38 § 103–3 (1979).

19. Plaintiffs do not allege that when they were arrested the deputies failed to inform them of their *Miranda* rights; therefore, for purposes of this appeal we will assume they were informed of those rights, including the right to an attorney. Further, as we explained in *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1144 (7th Cir.1983), the right to counsel is not violated by postponing the right to a telephone call where the alleged deprivation occurred prior to any accusatorial questioning or adversarial proceedings taking place. Here, the evidence shows that the plaintiffs were arrested, placed in the cell, and then released sometime later. There is no evidence that any adversarial proceedings took place.

reasonably protected from the constant threat of violence and physical assault ....." *Stokes*, 710 F.2d at 1125.[20] However, we do not agree that under the facts of this case having to endure threatening or angry looks, mutterings and screamed profanities arises to the level of a constitutional deprivation under *Stokes*. *See also Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir.1981); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir.1979).

There does exist, however, a question as to the length of time that the plaintiffs were detained in the holding cell. The plaintiffs claim that they were detained for a period of approximately four hours or more. In *Duran v. Elrod*, 542 F.2d 998, 999 (7th Cir.1976), we stated that the sole permissible interest of the state in detaining a person after arrest is to ensure their presence at trial. *Id.* Therefore, we held that pre-trial detainees are to suffer no more restrictions than are "reasonably necessary to ensure their presence at trial." *Id.* This standard was subsequently modified in *Jordan v. Wolke*, 615 F.2d 749 (7th Cir.1980), in light of the United States Supreme Court's opinion in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Quoting from *Bell*, the *Jordan* court noted that the question in determining if a claim exists is "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental pur-

pose." *Jordan*, 615 F.2d at 752 *quoting Bell*, 441 U.S. at 537, 99 S.Ct. at 1873. The answer to this question " 'generally will turn on whether an alternate purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternate purposes assigned [to it].' " *Jordan*, 615 F.2d at 752 *quoting Bell*, 441 U.S. at 538, 99 S.Ct. at 1873.[21] Although these cases concern the conditions of confinement, such as visitation rights and overcrowding, and not the fact of confinement itself, the underlying principle that the purpose of detention is to ensure the defendant's presence at trial applies equally to the time of detention. The principle is clear—detention must be justified, especially where, as in this case, there has been no independent appraisal of probable cause to arrest prior to the detention; if detention is not justified, it amounts to punishment prior to conviction.

Here, the plaintiffs were arrested for, at best, a minor misdemeanor. If they had been convicted, their punishment, given the small amount of money involved, would probably have been only a small fine. As far as we can discern, the only condition which needed to be satisfied in order to ensure plaintiffs' presence at trial was the posting of a small bond. There is no evidence in the district court opinion or the parties' affidavits and/or briefs in support

**20.** In its brief to this court, the plaintiffs state that the jury instruction approved of and quoted in *Stokes* provided that "[a] prisoner in a jail has a constitutional right to be reasonably protected from the constant threat of violence and physical assault from his fellow inmates. To obtain relief, he must show that the prison officials have failed to exercise reasonable care to prevent prisoners from intentionally inflicting harm or creating an unreasonable risk of harm to other prisoners." However, the plaintiff fails to quote a key phrase contained in the middle of that jury instruction. The jury instruction in that case read: "[a] prisoner in a jail has a constitutional right to be reasonably protected from the constant threat of violence and physical assault from his fellow inmates. To obtain relief, *he must show a pervasive risk of harm to inmates from other prisoners,* and he must show that the prison officials have failed to exercise reasonable care to prevent prisoners from inten-

tionally inflicting harm or creating unreasonable risk of harm to other prisoners." *Stokes*, 710 F.2d at 1124.

**21.** As noted in *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir.1981), "the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 534 [99 S.Ct. 1861, 1871, 60 L.Ed.2d 447] ... explained, 'what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment.' Thus, the constitutionality under a due process analysis of the nature or duration of pretrial detention turns on whether such detention amounts to 'punishment' in the constitutional sense. 'For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.' " (citation omitted).

of summary judgment justifying the length of detention. One could surmise that it took several hours to book the defendants or that the jail was extremely busy that night; however, we are not willing to make these assumptions since there is no evidence in the record warranting any conclusion justifying the four or more hour time period spent by the plaintiffs in the jail.[22] Because the district court did not address this issue and the record is silent on this point, we remand this issue back to the district court for determination.[23]

■ We also note that the Fourth Circuit Court of Appeals in *Fisher v. Washington Metro Area Transit Authority*, 690 F.2d 1133 (4th Cir.1982) recently addressed the issue of whether there are constitutional limits on the duration of time between the warrantless arrest and the pre-hearing detention of the arrested person.[24] In analyzing the United States Supreme Court's decision in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1974), the *Fisher* Court stated:

"From this we must conclude that the Court considers the reasonableness requirement of the Fourth Amendment does carryover past arrests to place limits of permissible duration upon this particular period of detention. The standard of reasonableness can only be that im-

plied in the Court's observation that it is to be 'brief' and, more specifically, that it is to be only that required 'to take the administrative steps incident to the arrest.' "

*Fisher*, 690 F.2d at 1140 *quoting, Gerstein*, 420 U.S. at 113–14, 95 S.Ct. at 862–63. The *Fisher* decision concluded that the relevant time period must be determined on a case-by-case basis. Applying this approach to the instant case Ill.Rev.Stat. ch. 38, § 109–1, which requires processing of arrestees "without unnecessary delay," is not, as the plaintiff argues in its brief, controlling when evaluating the constitutionality of the detention. Rather, under the *Fisher* and *Gerstein* approach, the question is whether the detainee was held for a "brief period of detention to take the administrative steps incident to the arrest." *Fisher*, 690 F.2d at 1141. The *Fisher* Court held that there was no constitutional violation since the evidence demonstrated that the officer who arrested the plaintiff and who was the subject of the 1983 action did not unreasonably detain the arrestee. However, as stated previously, the record as developed at this point does not reveal any comparable demonstration of timeliness. Thus, we remand this issue back to the district court for further investigation. If no reasonable ex-

22. Indeed, one could assume that it would take only one-half hour at most for this minor misdemeanor charge to be processed if all the plaintiffs were to fill out the various bond forms at one time.

23. The approximately four hours or greater spent in the jail does not, at least initially, appear to be significant. However, the plaintiffs were arrested and taken into custody in the middle of the night, without a warrant, for a minor offense. There was no independent determination by the local magistrate as to the validity of the police officers' probable cause determination. Under such circumstances, a question does exist as to the reasonableness of the time spent in the jail's holding cell, especially when there is no evidence in the record explaining why the plaintiffs were not immediately processed and released after arriving at the county jail. See *Reeves v. City of Jackson*, 608 F.2d 644, 650–52 (5th Cir.1979), where a person was held for 19 hours on a public drunkeness charge; there, the Fifth Circuit ex-

plained that it may have been proper to hold the person for 10 hours, which would be sufficient time for a person to sober up, but to hold a person 9 additional hours where the person still behaved in an abnormal manner would have indicated to his jailers that something was medically wrong with the detainee, and thus created an issue for the jury as to the reasonableness of the continued detention.

*Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689, 2693, 61 L.Ed.2d 433 (1979), where the court held that a person's Fourteenth Amendment rights were not violated when he was detained over a weekend, is not controlling in this case since, in *Baker*, a valid warrant was issued, with all the concomitant protections afforded by an independent magistrate's appraisal of probable cause to arrest.

24. Ill.Rev.Stat. ch. 38, § 109–1 states that:

"(a) A person arrested without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county, and a charge shall be filed."

cuse is presented, or that excuse is legitimately disputed, the question of liability is to be decided by the jury.[25]

## C. Claims against the private party under § 1983.

█ The plaintiffs allege that their rights were violated pursuant to a customary plan and agreement which existed between the defendant restaurant owner, Mr. Schneiter, and the defendant sheriff and his deputy sheriffs whereby the deputies would arrest any person named or "fingered" by Mr. Schneiter and put them in jail without a formal complaint or a charge and without the existence of probable cause. As explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), in order to maintain a 1983 action it not only must be demonstrated that a constitutional right was violated but also that this violation occurred under the color of state law. *Id.* at 150, 90 S.Ct. at 1604. Private parties have been found subject to liability under § 1983 when engaged in a conspiracy with one or more parties acting under the color of state law. *See, e.g., Brucar v. Rubin*, 638 F.2d 987 (7th Cir.1980). "The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of the petitioner's Fourteenth Amendment equal protection rights whether or not the actions of the police were officially authorized or lawful.... Moreover, a private party involved in such a conspiracy even though not an official of the State, can be liable under § 1983." *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605 (citations omitted). In order to establish a conspiracy, the plaintiff must demonstrate that the state officials and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights. *See Id.*

The plaintiffs point to two statements, one allegedly made by Mr. Schneiter as the plaintiffs left the restaurant threatening that he would take care of them in his "own way" and to another statement made by one of the arresting police officers stating that, if he were the plaintiffs, he would sue. Besides the alleged statements made by the defendants, the plaintiffs presented no other evidence, and admit in their interrogatories that they are without any other evidence in support of their conspiracy claim. Further, in affidavits submitted by the defendants, they all state that they have had no previous contact with one another.

A conspiracy may be demonstrated by circumstantial evidence, *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979); however, mere allegations of a conspiracy are insufficient to withstand a motion to dismiss. *See e.g., Tarkowski v. Robert Bartlett Realty*, 644 F.2d 1204, 1206 (7th Cir. 1980); *Dieu v. Norton*, 411 F.2d 761 (7th Cir.1969). It is not unreasonable to assume that since there is conflicting evidence in the record as to what occurred at the restaurant on the night of the plaintiffs' arrest, it is possible that Mr. Schneiter may very well have given less than reliable information regarding the incident at the restaurant to the police officers. However, providing false information to an arresting officer is not, by itself, sufficient to state a claim against that private party under § 1983. *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 326–27 (7th Cir.1978), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 53 (1979); *see also Arnold v. International Business Machines*, 637 F.2d 1350 (9th Cir.1981). Bare allegations of certain statements made by the defendants without, as the plaintiffs admit, any other proof of a conspiracy, is insufficient to sustain a conspiracy claim. In order to sustain a § 1983 action against a private individual, there must be some evidence of some concerted effort or plan between the private party (i.e. Schneiter) and the state

---

**25.** Judge Posner agrees with us on the fact that the unlawful detention issue may be properly for the jury to determine. He assumes we would disagree with his conclusion that if the jury finds the arrest unlawful, the jury must also find the detention unlawful. We do not disagree with this conclusion at least to the possible chain of causation that exists in this case.

officials (i.e. the Sheriff's department). Upon our examination of the parties' motions and affidavits in support of summary judgment, we are unable to discover a sufficient issue of fact, nor has any been referred to at oral arguments or in the parties' briefs, to support the theory that a customary plan existed between Mr. Schneiter and the sheriff department to arrest persons at the beckon of Mr. Schneiter. *See e.g., Smith v. Brookshire,* 519 F.2d 93 (5th Cir.1975). Therefore, we hold the dismissal of Mr. Schneiter from the § 1983 action was appropriate.

Count IV of the plaintiffs' complaint asked the district court to invoke its pendent jurisdiction over a claim against Mr. Schneiter alleging false arrest and imprisonment. The district court in this case obviously did not consider this count since it dismissed all the plaintiffs' § 1983 federal question claims. However, since we are reversing the district court on several of the § 1983 claims against the defendant deputy sheriffs, a question does exist as to whether the pendent jurisdiction of the district court may reach the false arrest and imprisonment claims against Mr. Schneiter, who now must be considered a pendent party to this action since we have dismissed the federal claim against him. In considering this question, we note that in order to establish pendent party jurisdiction, the constitutional requirements of the federal judicial power, derived from Article III of the Constitution, must be satisfied, and any statutory limits must be considered. *See Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 371–72, 98 S.Ct. 2396, 2401–02, 57 L.Ed.2d 274 (1978); *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *United States ex rel. Hoover v. Franzen,* 669 F.2d 433, 439–40 (7th Cir.1982).

The constitutional prong, which requires that there must be a federal claim of suffi-

cient substance and that both the federal and state claims arise from a "common nucleus of operative fact ... [such that the plaintiff] would ordinarily be expected to try [his claims] ... in one judicial proceeding ..." (*United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)), is satisfied in this case. However, the posture of the case where, such as here, a pendent party is involved must also be considered. In *Aldinger v. Howard,* 427 U.S. 1, 16–17, 96 S.Ct. 2413, 2421–2422, 49 L.Ed.2d 276 (1976), the Supreme Court refused to extend the pendent "party" jurisdiction of the federal courts in a § 1983 action to cover common law claims against a municipality.[26] *Aldinger* based its holding on the "language used in § 1343 [the statute conferring jurisdiction on federal district courts over civil rights cases] together with the scope of § 1983." *Aldinger,* 427 U.S. at 17, 96 S.Ct. at 2422 (explanation added). Since municipal corporations were not considered to be persons within the meaning of § 1983 and the jurisdictional grant of authority under 28 U.S.C. § 1343(3) was, and still is, restricted to actions "authorized by law," the Court concluded that Congress intended to further restrict the jurisdictional authority of district courts by refusing to allow joinder of a municipality as a pendent party in a § 1983 action. *See Lykins v. Pointer, Inc.,* 725 F.2d 645, 648 (11th Cir.1984).

Contrary to the opinion expressed by Judges Posner and Gibson, this case presents an analogous situation to *Aldinger* and thus is controlled by its holding. Similar to the position of the municipal corporation in *Aldinger,* Mr. Schneiter is not subject to suit under § 1983 since he is a private party. Only when a private party's actions can be tied to those of a state official does this constitute sufficient "state action" to provide a cause of action under § 1983. Since we have held that the

**26.** At that time in our legal history local governmental entities were not considered to be persons within the meaning of § 1983, a position which has now been reversed. *See Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, *Monell* "in no way qualifies the holding of *Aldinger* that the jurisdictional questions presented ... are statutory as well as constitutional." *Kroger,* 437 U.S. at 372 n. 12, 98 S.Ct. at 2402 n. 12.

**1354**

quantum of evidence introduced was insufficient to support a conspiracy claim and thus was properly disposed of on summary judgment, all that remains is the pendent common law claim against Mr. Schneiter. To exercise pendent party jurisdiction on remand of this case over the common law claims against Mr. Schneiter, a person who would not otherwise be in federal court but for the jurisdictional grant of authority contained in § 1343 over the other § 1983 parties, would be inconsistent with the Supreme Court's decision in *Aldinger.*

In his opinion Judge Posner argues that pendent party jurisdiction exists in this case because of the closeness of the claims and the convenience of the forum. However, the fact remains that *Aldinger* was decided on the issue of whether a pendent party can be brought into federal court solely on the coattails of another being sued in federal court. "[T]he addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress." *Aldinger,* 427 U.S. at 15, 96 S.Ct. at 2420. "[T]he extension of *Gibbs* to this kind of pendent 'party jurisdiction' ... presents rather different jurisdictional considerations." *Id.*

> "Resolution of a claim of pendent party jurisdiction, therefore, calls for careful attention to the relevant statutory language. As we have indicated, we think a fair reading of the language used in § 1343, together with the scope of § 1983, requires a holding that the joinder of a municipal corporation, like the county here, for the purposes of asserting a state law claim not within federal diversity jurisdiction, is without statutory jurisdiction of the district court."

*Id.* at 17, 96 S.Ct. at 2421–2422. As stated earlier, the fact that a private party is involved does not provide the requisite state action and 28 U.S.C. § 1343(3) pro-

vides that jurisdiction exists for § 1983 claim only to redress constitutional deprivation taken "under color of any state law." *Cf. Finch v. Mississippi State Medical Ass'n, Inc.,* 585 F.2d 765, 780 (5th Cir.1978) (no pendent party jurisdiction over private party in a § 1983 action); *Miletich v. Raley,* 593 F.Supp. 124 (D.Nev.1984); *Watkins v. Roche,* 529 F.Supp. 327, 332–33 (S.D.Ga.1981); *see also, Hampton v. City of Chicago,* 484 F.2d 602, 610–11 (7th Cir. 1973) (no pendent party jurisdiction over city in § 1983 action). The refusal to extend jurisdiction over a private party is a logical application of the *Aldinger* decision, and the case cited by Judge Posner is easily distinguished from the fact situation set forth herein.[27]

**D. Claim of the minor for emotional distress.**

█ In their complaint, the plaintiffs allege that Kimberlee Kosmel, the daughter of Hugo and Judith Kosmel, was left alone in the trailer and thus placed in great fear for her safety as a result of her parents being arrested, handcuffed, and taken into custody in the middle of the night. The evidence reveals that the deputies were aware that a 15-year old minor was present at the time of the arrest. In Mrs. Kosmel's deposition, she stated that she told one of the deputies that her daughter could not be left alone. The police informed her that the minor could either come along with them and stay in the sheriff's car during the night, with the apparent understanding that she would remain in the squad car outside of the station, or she could remain in their camper.[28] Mrs. Kosmel, when faced with this option, decided that her daughter, in all probability, would be safer within the camper.

In *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), we held that the abandonment of several young children by police officers in an automobile on the side of a road on a cold evening, which ultimately led to the

---

**27.** *Pitrone v. Mercadante,* 572 F.2d 98, 100 (3d Cir.1978) (per curiam) (court found independent basis for federal jurisdiction).

**28.** The evidence discloses that the camper did have heat, electricity and a lock on the door.

children's emotional injury, violated the children's due process right under the Fourteenth Amendment and thus stated a claim under § 1983. In *White*, the children's uncle was arrested for drag racing after his car was stopped by the police on the busy and limited-access Chicago Skyway. After his arrest, the children's uncle pleaded with the officers to take the children to the police station or a phone booth where they could contact their parents. The officers refused to provide any such aid and left the children stranded in the abandoned automobile. Because of the extreme cold, the children were forced to leave the car, cross several lanes of traffic, and search for a telephone booth. Upon reaching a telephone, they called their mother who in turn called the Chicago police, but again the police department refused to render any assistance. As a result of the experience it was alleged that the children suffered mental anguish and that one child had to be hospitalized for a week. In *White*, we stated:

"It is clearly established that although officials may not be held liable for simple negligence, they may be held liable for 'gross negligence' or 'reckless disregard' for the safety of others. In the case before us, the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence."

*Id.* at 385. When judged against this standard, the facts of this case do not rise to such a level of indifference as to constitute gross negligence. Better options certainly could have been presented to the plaintiffs by the law enforcement personnel, and certainly the commanding officer, who directed the arrest and conveyance, as well as the arresting deputy sheriffs should have been more sensitive to the needs of the minor when the fact of the minor's presence became known. The facts as recited here do not arise to the level of a constitutional deprivation; however, they do dem-

onstrate an exercise of extremely poor judgment.

**E. Claims against the Sheriff and the County of Will.**

■■■ The sheriff was properly dismissed from this case. In *Rizzo v. Goode*, 423 U.S. 362, 374, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976), the Supreme Court indicated that a supervisory official cannot personally be held liable under a *respondeat superior* theory in a § 1983 action. Following the language contained in *Rizzo*, our court has also refused to hold supervisory officials liable based upon a *respondeat superior* theory of liability. *See Schultz v. Baumgart*, 738 F.2d 231, 238–39 (7th Cir. 1984); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983); *Chapman v. Pickett*, 586 F.2d 22 (7th Cir.1978). In this case, the plaintiffs alleged that the office of the sheriff was used to force payment of the bill and that all defendants, the sheriff, the deputies, and Schneiter, knew that no probable cause existed for the arrest. However, the only persons in the sheriff's department that participated in the arrest were a shift sergeant, who allegedly issued the arrest order, and the deputies. (For some unknown reason, the shift sergeant was not named as a party in this action.) The plaintiffs neither have alleged that the shift sergeant was not properly trained by the sheriff, which if they had it would have established the necessary direct participation, nor have they presented any facts demonstrating that the sheriff participated directly in the arrest.

■■■ The County of Will was also properly dismissed from the action. In Count I of the plaintiffs' complaint, they allege that the County of Will was responsible for the acts of the other defendants since those acts were done under the color of state law. Whatever the liability of the other defendants are in this case, this allegation is insufficient to support a cause of action against the County of Will in this circuit. In *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir.1983), this court reiterated the holding expressed in *Monell v. Department of Social Services*, 436 U.S. 658, 98

S.Ct. 2018, 56 L.Ed.2d 611 (1978) that a municipality also cannot be liable under § 1983 based upon a *respondeat superior* theory. *See also, Bell v. City of Milwaukee,* 746 F.2d 1205 at 1269, 1272–73 (7th Cir. Sept. 4, 1984) ("A custom, policy or practice cannot be inferred from a single incident of unconstitutional behavior...." *Id.* at 1272).

In Count III of their complaint, the plaintiffs allege that the County is responsible for the conditions under which the plaintiffs were made to suffer during their period of confinement. Earlier in this opinion we held that the verbal abuse of the plaintiffs by other detainees was not sufficiently severe as to constitute a denial of their Fourteenth Amendment rights and that any denial of the right to consult with an attorney did not rise to a constitutional deprivation under the facts of this case. We further stated that the failure of the jail guards to segregate the detainees by sex also did not violate the due process rights of the plaintiffs. Since we deny these claims, any corresponding claims against the county must also be denied. As to the period of detention, any claim against the County of Will must also fail. If the deputies did in fact violate the plaintiffs' constitutional liberty interest by holding them for an unreasonable amount of time, such conduct flows from those actions. Liability would only attach to the county if the plaintiffs could establish that the County implicitly authorized, approved, or knowingly acquiesced in the unconstitutional behavior of the offending officers. *Lenard,* 699 F.2d at 885. The mere inaction on the part of the county would be insufficient to establish liability. *Id.* Although the plaintiffs' complaint alleges in general terms that the county is responsible for the failure of the sheriff and his jailer to allow the plaintiffs to post bond within a reasonable time, the complaint lacks specific allegations of any pattern of inaction or lack of enforcement of the bonding procedures. Further, there is no evidence in the record establishing such a practice. Therefore, since no evidence was presented as to the county's degree of culpability as a separate entity apart from its officers, the claims against the county were properly dismissed.

### III.

For the reasons detailed in this opinion, we AFFIRM in part, and REVERSE and REMAND in part for proceedings consistent with this opinion.

POSNER, Circuit Judge.

█ I join so much of Judge Coffey's opinion as holds that the district judge was right to dismiss, on the defendants' motion for summary judgment, the plaintiffs' claims that the restaurant owner, the sheriff, and the county violated section 1983, and that the defendant police officers violated section 1983 by leaving the Kosmels' 15-year-old daughter in the camper, by failing to segregate the plaintiffs by sex in the jail, and by denying the plaintiffs' request for counsel.

I part company with Judge Coffey in just two respects. Although I agree that summary judgment for the defendants on the plaintiffs' claims of unlawful arrest, and of unlawful detention following arrest, was improper, my analysis is different from his. And I disagree that the plaintiffs' state-law claims against the restaurant owner are outside the federal courts' "pendent parties" jurisdiction.

1. If the plaintiffs consented to the entry of the police into their campers and having done so voluntarily revealed their identities as the people who had left the Marketplace Restaurant without paying their bills, then probably the arrest was lawful. The police had gotten a complaint that these people had left the restaurant without paying for food and drinks that they had not only ordered but consumed. This was not just the restaurant owner's say-so; a waitress whom the police interviewed corroborated his complaint. A reasonable jury could conclude that the police had probable cause to arrest these people. The problem was to identify them. The problem disappeared if they volunteered

their identity to the police—provided the admission was not obtained through an unlawful entry. However, so far as one can tell from the record, the police knocked at the door of each of the campers, identifying themselves as police, and when the door was opened simply walked in and started asking questions. They did not ask for permission to enter, or ask questions from the threshold as in *McKinney v. George,* 726 F.2d 1183, 1188 (7th Cir.1984). When police knock at the door of a house (and for the moment I am assuming that a camper is a house), and the householder opens the door, he does not thereby consent to an entry into his house. He opens the door so that the police will not break it in. On the record made so far, there was no consent to enter, though the fuller record that will be made at the trial may show that there was consent to enter or maybe even that the police questioned at least some of the plaintiffs from outside the campers—which would have had to be pretty large for the police to have to go inside to talk to the occupants. But the facts developed in the summary-judgment proceeding do not establish that the police had consent to enter the campers.

Could the police enter without consent? The Supreme Court held in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that except in an emergency the police may not enter a home to make an arrest for a routine felony unless they have a warrant. For these purposes, the campers that the plaintiffs were arrested in may well have been homes. The campers were parked for the night and their occupants had gone to bed (it was after midnight). It is true that a camper is mobile in a way that a house is not; but as a logical matter this goes to the issue whether it was feasible to obtain a warrant. See *United States v. Williams,* 630 F.2d 1322, 1326 (9th Cir.1980); *People v. Carney,* 34 Cal.3d 597, 604–10, 194 Cal. Rptr. 500, 503–07, 668 P.2d 807, 810–14 (1983), cert. granted, — U.S. —, 104 S.Ct. 1589, 80 L.Ed.2d 122 (1984); *People v. Gordon,* 156 Cal.App.3d 74, 80–81, 202 Cal. Rptr. 566, 570 (1984); cf. *United States v.*

*Miller,* 460 F.2d 582, 585–86 (10th Cir. 1972). It was here. Since it was apparent (from the hour) that the plaintiffs would remain for the night, the police had at least six hours to get a warrant; that should have been enough time. Furthermore, it was not a routine felony that they were investigating, but a routine misdemeanor, so they could not have thought they must strike swiftly to protect the public safety. Of course they did not know the plaintiffs' names or exact whereabouts in the campground and might have had difficulty persuading a magistrate to issue a warrant to rout out the whole population of the campground in the middle of the night, merely to find the perpetrators of a misdemeanor. But under the modern view that a warrant protects personal rights by interposing a magistrate between the police and the citizen, rather than the older view that a warrant is a menace to rights because it shields the police from tort liability to the people whom they search or seize (see, e.g., Lasson, The History and Development of the Fourth Amendment to the United States Constitution 55, 103 (1937)), it is in just such cases as this that a judicial officer should be required to decide whether the circumstances justify the police in invading a citizen's privacy. Maybe a magistrate would have refused to issue a warrant—maybe he would have had to refuse—on the ground that it would have been a general warrant. But this possibility cannot strengthen the case for arresting these people without a warrant.

■ The difficult question is whether the police are immune from damage liability. As the arrests were made before *Payton* was decided, we must decide whether the police could reasonably have believed that their conduct was authorized by the law as it then stood. See *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The answer depends on whether the police had probable cause to make the arrests.

Although at the time of these arrests there was no flat rule that arrests within the home required a warrant unless there

was an emergency, no one reasonably could have believed that the police may without consent or a warrant enter a home to arrest a person *on misdemeanor charges*, at least if there is no emergency that would preclude getting a warrant. In *Coolidge v. New Hampshire*, 403 U.S. 443, 459–62, 91 S.Ct. 2022, 2034–36, 29 L.Ed.2d 564 (1971) (plurality opinion), four members of the Court had suggested (years before the arrests in this case) that a warrant is always required to arrest a person in the home except in an emergency. Two other members of the Court had thought this was not so *in the case of a felony*, see *id.* at 510–11 and n. 1, 91 S.Ct. at 2060 and n. 1 (concurring and dissenting opinion). In *Payton* even the dissenting Justices thought that an arrest in the home without a warrant was (and long had been) permissible only if rigorous conditions were satisfied, including that the arrest be (1) in the daytime and (2) for a felony. See 445 U.S. at 616, 100 S.Ct. at 1395. Neither condition was satisfied in this case. See also *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 2097 and n. 11, 80 L.Ed.2d 732 (1984).

On the other hand, the status of campers was unclear five years ago; indeed, it is so today, given the grant of certiorari in *Carney*. Maybe, as argued in the petition for certiorari in *Carney*, motor homes will be assimilated to automobiles, where often a warrant is not required to conduct a search or arrest an occupant. See —— U.S. ——, 104 S.Ct. 1589, 80 L.Ed.2d 122 (1984). The argument has enough merit to prevent us from concluding that the police violated the plaintiffs' "clearly established" constitutional rights by arresting them without a warrant; and therefore the police cannot be held liable in damages for the arrest merely because there was no warrant. See, e.g., *Davis v. Scherer*, —— U.S. ——, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1984). But what was perfectly clear when these arrests were made, as now, is that an arrest is not proper without probable cause. So if there was no probable cause, there was no immunity; if there was probable cause, then, as just pointed out, there was immunity. The issue of immunity will

thus be resolved automatically by the jury's resolution of the issue of probable cause; but the jury should not be asked to decide immunity.

It is very doubtful that the defendants in this case had probable cause to arrest the plaintiffs before the defendants entered the campers and began questioning the plaintiffs, even if they had probable cause to believe that a crime had been committed by someone. The police knew that the people who had been in the Marketplace Restaurant were somewhere in the campground, but did not know which campers were theirs. True, the record does not show how many campers there were, and even if there were many maybe by the time the police got to the plaintiffs' campers lawful inquiries of the occupants of the other campers had made it all but certain that the plaintiffs were indeed the culprits. But these are matters for a trial. If, as seems probable on the present record, the plaintiffs did not consent to the entry by the police into their campers, then the plaintiffs' answers to the policemen's questions almost certainly were involuntary and therefore could not supply the missing probable cause for the arrests. If police burst into a home in the middle of the night and immediately ask a question ("Were you at the Marketplace Restaurant earlier tonight?") and the homeowner blurts out the answer, the answer must be regarded as coerced rather than volunteered. Confronted with this intimidating and unlawful official intrusion, the homeowner is in no position to make a free choice whether to answer the first question he is asked or stand silent and see what happens. And a coerced admission—an independent violation of the Fourteenth Amendment and one also actionable under section 1983, see, e.g., *Duncan v. Nelson*, 466 F.2d 939, 944 (7th Cir.1972)—obviously could not supply the probable cause necessary to make an arrest lawful.

I conclude that the only issues for trial with regard to the lawfulness of the entries and arrests are the closely related issues of consent and probable cause. But as these

are triable issues, it was wrong to dismiss this part of the complaint on the defendants' motion for summary judgment.

On the question of unlawful detention, I differ in two respects with Judge Coffey's analysis. The first concerns his implicit assumption that the question is separable from that of unlawful arrest. It is true that even if the arrests are found to be lawful on the fuller record that will be developed at trial, the ensuing detention, if it was unduly prolonged, could be an independent violation of the plaintiffs' rights: a deprivation of liberty without due process of law. But the converse (that the detention might be found lawful even if the arrests were found to be unlawful) is not true. If the arrests are found to be unlawful, the police are liable for all of the foreseeable consequences of the arrests, including a protracted detention, whether or not that detention was unreasonable in and of itself. The ordinary rules of tort causation apply to constitutional tort suits. See *Parrett v. City of Connersville,* 737 F.2d 690, 695 (7th Cir.1984), and cases cited there. Similarly, while I agree that the activities of the "burly drunk" who "glared and muttered" at the plaintiffs while they were in jail invaded no constitutional right, if the arrests or detention were unlawful then any indignities inflicted by the drunk would be a consequence of the defendants' unlawful conduct for which the defendants would be liable, because the indignities were a reasonably foreseeable consequence of arresting the plaintiffs.

■ 2. I think the district court can retain pendent jurisdiction over the plaintiffs' state-law claims against the restaurant owner. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), held that since (as the Supreme Court then believed, though it later changed its mind, in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)) section 1983 had not made counties or other public bodies liable under the statute, civil rights plaintiffs ought not be able to drag these entities into federal court through the con-

cept of pendent jurisdiction. See 427 U.S. at 16–17, 96 S.Ct. at 2421–22. There is no similar policy of immunizing private individuals from liability under section 1983. They are "persons" within the meaning of section 1983. If the owner of the Marketplace Restaurant, though a private individual, had acted in concert with the police officers, rather than just complaining to them as in *Johnson v. Miller,* 680 F.2d 39, 40–41 (7th Cir.1982), and *Butler v. Goldblatt Bros., Inc.,* 589 F.2d 323, 327 (7th Cir.1978), then he (unlike Will County, under the view that the Supreme Court took in *Aldinger* ) would have been fully liable under section 1983. See, e.g., *Lopez v. Vanderwater,* 620 F.2d 1229, 1237–38 (7th Cir.1980).

The positions of a county and of a private individual are not symmetrical. Although most local government is not within the protection of the Eleventh Amendment as it has been interpreted, see, e.g., *Heiar v. Crawford County,* 746 F.2d 1190, 1194 (7th Cir.1984), there is a natural reluctance to assume that Congress would want local government to be suable in federal court under a jurisdictional concept ("pendent parties" jurisdiction) not mentioned in the Constitution, when Congress had decided not to make the conduct for which the local government had been haled into federal court a violation of federal law. But it is hard to see why this deferential attitude should carry over to the case where a person suing the police for violating his civil rights adds a pendent claim against the private individual who incited the police to commit the violation. It is a great convenience to the plaintiff to be allowed to consolidate such closely related claims in a single, and federal, forum; and it does not involve the same challenge to the prerogatives of state and local government as when a government agency is the target of the pendent claim.

The "pendent parties" concept has, it is true, wobbly constitutional foundations. See Currie, *Pendent Parties,* 45 U.Chi.L. Rev. 753 (1978). It is not mentioned in Article III, and can be teased out of it only

by supposing that separate but related claims against different parties can nonetheless constitute a single "case" even though one of the claims would, by itself, be outside the jurisdiction of the federal courts (there is no diversity of citizenship between the plaintiffs in this case and the restaurant owner); and it is harder to do that than to view two closely related claims against a single defendant—the more conventional pendent claims jurisdiction—as constituting one case. It brings into the federal courts persons as well as claims that have no business there, for no better reason (though it is not a bad reason) than that it would be a convenience to the federal claimant to be able to litigate related claims—claims against joint tortfeasors—at the same time in the same federal forum. It is merely a convenience in an area such as civil rights where there is concurrent federal and state jurisdiction, for the plaintiff could litigate all his claims in a state court; he would not have to bring two suits. After *Zahn v. International Paper Co.,* 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973), the concept of pendent parties jurisdiction seems quite dead at least when used to enable a diversity claimant to pull in a second diverse defendant, if the second claim is for less than the statutory minimum amount in controversy, see *Hixon v. Sherwin-Williams Co.,* 671 F.2d 1005, 1008–09 (7th Cir.1982); and whether the concept retains vitality in any context was expressly left open by the Supreme Court in both *Aldinger,* 427 U.S. at 18, 96 S.Ct. at 2422, and *Moor v. County of Alameda,* 411 U.S. 693, 713–16, 93 S.Ct. 1785, 1797–99, 36 L.Ed.2d 596 (1973).

Maybe someday it will be rejected entirely; we described it recently as "embattled." *Bernstein v. Lind-Waldock & Co.,* 738 F.2d 179, 187 (7th Cir.1984); see also *Thomas v. Shelton,* 740 F.2d 478, 487 (7th Cir.1984). But outside the Ninth Circuit, which has long rejected the doctrine of pendent parties across the board, see, e.g., *Blake v. Pallan,* 554 F.2d 947, 957–58 (9th Cir.1977), there is substantial authority, post-*Zahn* and post-*Aldinger,* for retaining the doctrine where the main claim is, as in

this case, a federal claim—including authority in this circuit. See e.g., *In re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 913–14 (7th Cir.1983); *Weinberger v. Kendrick,* 698 F.2d 61, 76–77 (2d Cir.1982) (Friendly, J.); *Joiner v. Diamond M Drilling Co.,* 677 F.2d 1035, 1040–41 (5th Cir.1982); *North Dakota v. Merchants National Bank & Trust Co.,* 634 F.2d 368, 370–74 (8th Cir.1980) (en banc); *Stewart v. United States,* 716 F.2d 755, 758 (10th Cir.1982); *Lykins v. Pointer Inc.,* 725 F.2d 645, 648–49 (11th Cir.1984). Diversity cases such as our *Hixon* decision are distinguishable. Among other things, to allow the pendent parties concept to be used to add a defendant against whom the plaintiff has a claim for less than the statutory minimum amount in controversy would bring into the federal courts a class of claims limited, by definition, to petty state-law claims. In the present case, as in many cases where the pendent parties concept is used to add a state-law claim to a federal claim, the state-law claim is not petty; serious tortious misconduct—false arrest and false imprisonment—is alleged against the restaurant owner.

True, the cases we have cited to show the continued vitality of the pendent parties concept in the federal-question context are not section 1983 cases, and some are distinguishable on that ground. In *Kendrick,* for example, the federal claim was within the exclusive jurisdiction of the federal courts, so could not have been joined with the plaintiff's state-law claim in state court. *Amoco Cadiz* and *Joiner* are admiralty cases, and there is a tradition of liberal joinder in admiralty. Whether the pendent parties doctrine is available in a section 1983 case is therefore an open question. *Johnson v. Miller, supra,* 680 F.2d at 41; see also *Williams v. Bennett,* 689 F.2d 1370, 1379–80 (11th Cir.1982). The two circuits that have addressed the question are split. Compare *Traver v. Meshriy,* 627 F.2d 934, 939 (9th Cir.1980), with *Finch v. Mississippi State Medical Ass'n, Inc.,* 585 F.2d 765, 780 (5th Cir.1978). But I cannot myself see why, once an overbroad

reading of *Aldinger* (as in *Finch*) is rejected, pendent party jurisdiction, if available in other federal-question cases, should not be available in a section 1983 case. As I have said, such a jurisdictional doctrine is a great convenience to the plaintiff—as great as in any other case in which pendent party jurisdiction is invoked, except where the federal courts' jurisdiction over the federal claim is exclusive. And while it is true (as this qualification implies) that the civil rights plaintiff can obtain the same cost savings by bringing both his federal and state claims in state rather than federal court, many civil rights plaintiffs anticipate a friendlier reception from the federal court; and whether or not this preference is entirely justified today, it is no doubt one of the reasons why the federal courts were given jurisdiction over civil rights actions (and in the same section—section 1—of the statute that created the substantive right now codified in 42 U.S.C. § 1983) before there was a general federal-question jurisdiction. Compare Act of April 20, 1871, ch. 22, § 1, 18 Stat. 13, now 28 U.S.C. § 1343(a)(3), with Act of March 3, 1875, ch. 137, § 1, 18 Stat. 470, now 28 U.S.C. § 1331. Access to a federal forum was intended to be a right of section 1983 plaintiffs, and would be impeded by preventing the joinder of a closely related claim against private defendants in federal court under the pendent parties concept.

FLOYD R. GIBSON, Senior Circuit Judge, concurring in part and dissenting in part.

■ I concur specifically in Judge Coffey's probable cause determination, *see supra* at 1347, and, also agree with both Judge Coffey and Judge Posner that if the arrest was unlawful then the defendants are liable for all the foreseeable consequences stemming from the arrests. Although I agree that this case should be remanded for a jury trial, I feel strongly that the officers in this case had neither probable cause nor the right to arrest these plaintiffs under the factual circumstances of this case. An arrest, without a warrant and without the benefit of a filed complaint, seems to me to violate an individual's right under the Fourth Amendment to be free from unreasonable seizures and the right under the Fourteenth Amendment to due process of law. In all other respects, I concur in Judge Coffey's opinion except as follows.

■ First, I disagree with Judge Coffey and concur with Judge Posner on the issue of the defendant police officers' immunity. The question of their immunity may be decided as a matter of law and need not be submitted to the jury. It is clearly established that the Fourth Amendment requires that officers have probable cause for an arrest. Thus, if in this case there was no probable cause for the arrests, an issue to be determined by the jury, then there is no immunity under *Harlow* for the official defendants.

■ Second, I disagree with Judge Coffey's determination that the restaurant owner, Schneiter, must be dismissed entirely from this action. I agree with Judge Posner that Schneiter should be retained in the action under the doctrine of pendent parties.

Finally, I disagree with both Judge Coffey and Judge Posner on the issue of dismissing the § 1983 claim against Schneiter. The plaintiffs allege that their rights were violated pursuant to a customary plan and agreement which existed between Schneiter and the Sheriff, or the Sheriff's deputies, to arrest anyone named or fingered by Schneiter. In resolving this issue on appeal, it is essential to remember that the plaintiff's complaint need only be sufficient to survive a motion for summary judgment. Summary judgment should not be granted unless it is clear that the plaintiffs would be unable to recover under any conceivable set of facts. *Murray v. Chicago*, 634 F.2d 365, 366 (7th Cir.1980), *cert. granted sub nom., Finley v. Murray*, 454 U.S. 962, 102 S.Ct. 501, 70 L.Ed.2d 377 (1981), *cert. dismissed*, 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366 (1982).

I think the Supreme Court's decision in *Adickes v. Kress*, 398 U.S. 144, 90 S.Ct.

1598, 26 L.Ed.2d 142 (1970), is directly on point and is controlling in this case. It is clear that a plaintiff will be entitled to relief under § 1983 if he or she can show that a private individual and a public official somehow reached an understanding to violate the plaintiff's constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605; *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir.1980); *Brucar v. Rubin*, 638 F.2d 987, 993 (7th Cir.1980), *quoting, Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605.

In *Adickes*, as in this case, the defendants supported their motion for summary judgment by pointing to uncontested facts in affidavits establishing that no pre-arranged conspiracy existed between the private party and the police, and by pointing out that the plaintiff had failed to allege any knowledge of communication between the private party and the police. *Adickes*, 398 U.S. at 153–56, 90 S.Ct. at 1606–07. In *Adickes*, the plaintiff argued that even though she had no personal knowledge of an agreement between the private party and police, the sequence of events created a substantial enough possibility of a conspiracy to allow her to proceed to trial, especially given the fact that direct evidence of a conspiracy could come only from adverse witnesses. The Supreme Court agreed with the plaintiff and held that, because the defendants failed to foreclose the possibility of an unconstitutional agreement between a police officer and an employee of the private party, the motion for summary judgment should have been denied. *Id.* at 157–58, 90 S.Ct. at 1608–09.

A similar failure on the part of the defendants in this case is crucial, and necessitates denying their motions for summary judgment. By the uncontroverted testimony in their affidavits, the defendants have negated the plaintiff's allegations of a pre-conceived or a customary plan between Schneiter and someone at the Sheriff's office. However, the defendants have not negated the possibility of a spontaneous agreement between Schneiter and whom-

ever he spoke with when he phoned in the complaint. All the plaintiffs needed to do, to survive a motion for summary judgment, was, first, allege that an agreement was reached between Schneiter and whomever he spoke with at the Sheriff's office, *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir.1979), *rev'd on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *see also, Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973). Second, the plaintiffs needed to allege overt acts in support of that allegation. *See Tarkowski*, 644 F.2d at 1206, *quoting, Sparkman v. McFarlin*, 601 F.2d 261, 268 (7th Cir.1979) (en banc) (Sprecher, J., concurring); *Brucar*, 638 F.2d at 993. The plaintiffs have met these requirements, and their allegations were not controverted by the defendants' affidavits.

The defendants do not dispute that Schneiter called the Sheriff's office, and thus initiated these deplorable arrests; nor do they adduce any testimony regarding the content of the conversation between Schneiter and the officer with whom he spoke. There is nothing in any of the defendants' affidavits which disclaims that Schneiter and someone at the Sheriff's office reached an agreement regarding how the plaintiffs were to be treated. It here should be noted that Schneiter made the threat that he would take care of them in his own way. Further, there is nothing in the affidavits that precludes the possibility that Moss and the other deputies acted with an awareness of such agreement. Indeed, given that one of the deputies informed the plaintiffs that he would sue if he were in their position, a jury could find that an agreement *was* reached and *was* communicated to the deputies.

It is true that simply giving information to the police is not sufficient to constitute a private party's participation in an arrest for purposes of § 1983. *Tarkowski*, 644 F.2d at 1206; *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 326 (7th Cir.1978), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 53 (1979). However, when read in

the light most favorable to them, the plaintiffs' complaint alleges more than that Schneiter simply lodged a complaint with the Sheriff's office; it alleges that the defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski*, 644 F.2d at 1206, *quoting, Sparkman*, 601 F.2d at 268 (Sprecher, J., concurring).

When the pleadings, motions, affidavits, and briefs on appeal are considered in the light most favorable to the plaintiffs we have the following essential facts. The plaintiffs alleged that Schneiter threatened to take care of them in his "own way;" Moss obtained information from Schneiter which, while sufficient to warrant an investigation, was not sufficient to establish probable cause for an arrest; and Moss relayed this information to his shift sergeant who ordered that the plaintiffs be arrested. The burden was on the defendants to show the absence of any genuine issue of material fact. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608. Because an agreement could have been reached between Schneiter and the recipient of the complaint, there are material issues of fact as to whether such an illegal agreement was reached and whether the deputies acted with an awareness of that agreement.

It is conceivable that a jury could infer, from the sequence of events, that Schneiter and whomever he spoke with at the Sheriff's office had a "meeting of the minds" as to how the plaintiffs were to be treated. *Id.* at 158, 90 S.Ct. at 1609. Thus, I would also reverse and remand for trial against defendant Schneiter on the conspiracy issue under § 1983.