Ira William HOLDEMAN and Lois Marie Holdeman, Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION, Howard R. Elliott, Jr., Stephen R. Oelslager, John W. Helpin, W.M. Ittel, Finley Excavating Company, Thomas Edward Sears, Joseph Galbreath, and Dan Finley Galbreath, Defendants.

No. S 84–65.

United States District Court, N.D. Indiana, South Bend Division.

Dec. 8, 1986.

David T. Stutsman, Douglas A. Mulvaney, Elkhart, Ind., Lawrence J. Clifford, South Bend, Ind., for plaintiffs.

Joseph V. Simeri, Mark D. Boveri, South Bend, Ind., Charles W. McNagny, Fort Wayne, Ind., for defendants.

Thomas Edward Sears, pro se.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

Plaintiffs' Amended Complaint for Damages filed December 6, 1984, asserted claims under 42 U.S.C. § 1983 and § 1985 together with various pendent state claims under Indiana law. Plaintiffs withdrew their claims under 42 U.S.C. § 1985 on October 9, 1985. Defendants, Finley Excavating Company, Joseph Galbreath and Dan Finley Galbreath, filed a motion for summary judgment with respect to the claims asserted against them by plaintiffs under 42 U.S.C. § 1983. Defendants, Consolidated Rail Corporation (Conrail), Howard R. Elliot, Jr., Stephen R. Oelslager, John W. Helpin and W.M. Ittel have filed a motion for summary judgment on all the claims

asserted by plaintiffs against these defendants and the Finley defendants have joined in said motion. The parties have all briefed the issues and oral argument has been heard on the motions on several occasions. Discovery has been concluded and this court has carefully reviewed all the depositions filed in this case [1] as well as the pleadings, answers to interrogatories, admissions and affidavits. At a final pretrial conference held in this case on October 31, 1986, the parties presented arguments on these motions. At that time, Plaintiffs basically conceded that they were not asserting claims under 42 U.S.C. § 1983 against Conrail or Finley Excavating Company but only against the other named defendants.

 Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be entered if the pleadings, depositions, answers to interrogatories, admissions and affidavits on file show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.Proc. 56(c). The party seeking summary judgment has the burden of establishing the lack of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Backes v. Valspar Corp.,* 783 F.2d 77 (7th Cir.1986). A material fact is one which might affect the outcome of the case under the governing law, *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see Terket v. Lund,* 623 F.2d 29, 31 (7th Cir.1980). So factual disputes that are irrelevant or immaterial do not provide a basis for denying a summary judgment motion. *Id.* Further, the dispute about a material fact must be "genuine", that is, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The court must view the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See, e.g., Box v. A & P Tea Co.,* 772 F.2d 1372, 1375 (7th Cir.1985); *Korf v. Ball State University,* 726 F.2d 1222 (7th Cir.

---

1. The following depositions have been filed, published and carefully examined here:

| Name of Deponent | Date of Deposition | Date Filed |
| --- | --- | --- |
| Lois Marie Holdeman | April 16, 1984 | Sept. 12, 1984 |
| Ira William Holdeman | April 26, 1984 | Sept. 12, 1984 |
| Howard Robert Elliott, Jr. | August 22, 1984 | Feb. 12, 1985 |
| John W. Helpin | August 22, 1984 | Jan. 14, 1985 |
| William M. Ittel | August 22, 1984 | Jan. 14, 1985 |
| Stephen Ray Oelslager | August 22, 1984 | Nov. 12, 1984 |
| Daniel Finley Galbreth | February 19, 1985 | Apr. 18, 1985 |
| Joseph A. Galbreth | February 19, 1985 | Apr. 18, 1985 |
| Charles Norman Frye, Jr. | August 12, 1985 | Sept. 20, 1985 |
| Charles Allen Kern | August 12, 1985 | Sept. 4, 1985 |
| Willie Wills | August 12, 1985 | Sept. 19, 1985 |
| Richard Willard Brotherson | July 10, 1985 | Aug. 20, 1985 |
| Dennis Joseph Gough | July 10, 1985 | Aug. 5, 1986 |
| Joseph Lee Ledbetter | July 10, 1985 | Aug. 5, 1986 |
| Gilbert B. Smith | July 10, 1985 | Aug. 20, 1985 |
| Patrick J. Whisler | July 10, 1985 | Oct. 21, 1985 |
| Kent J. Yoder | July 10, 1985 | Nov. 27, 1985 |
| James L. Holdeman (2 Vols.) | June 2, 1986 | Oct. 31, 1986 |
| Lois Marie Holdeman | June 30, 1986 | Sept. 16, 1986 |
| John Holdeman | June 30, 1986 | Sept. 20, 1986 |

1984). However, at the summary judgment stage, it is not the court's function to weigh the evidence and determine the truth of the matter. Rather, the court must determine whether there is a genuine issue for trial which requires the court to determine whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 106 S.Ct. at 2511. Thus, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

Plaintiff Ira William Holdeman's claims under 42 U.S.C. § 1983 against all the defendants in this case are primarily premised on allegations of wrongful and false accusations, illegal and wrongful search, and illegal and wrongful arrest and imprisonment. The status of the defendants vary, however, with respect to these claims and therefore requires different legal standards be applied to determine their respective liability under § 1983. There is no dispute that four of the named individual defendants, Howard R. Elliott, Jr., Stephen R. Oelslager, John W. Helpin and W.M. Ittel, were acting under color of state law with respect to the activities they engaged in that gave rise to this lawsuit. The other named individual defendants, Thomas Edward Sears, Joseph Galbreath and Dan Finley Galbreath, however, were private citizens and thus are not subject to liability under § 1983 unless they were acting in concert with the state or its officials to achieve a deprivation of another's civil rights. With this distinction in mind, the court will now turn to a discussion of the material facts that are undisputed in this case.

## II.

On the night of February 2, 1982, a very cold, windy night with snow on the ground, Thomas Edward Sears, an employee of Finley Excavating Company (Finley) was plowing snow at the Conrail yards in Elkhart, Indiana. Finley had a contract with Conrail for snow removal at the Elkhart Conrail yards and also leased some land from Conrail on which to store its equipment. This was a fenced area referred to as the Finley compound. Outside the compound, and across the road from the compound, Finley had a fuel tank containing diesel fuel that was used by Finley for its equipment. About 10:30 p.m. to 10:40 p.m., Mr. Sears went to the Finley fuel tank to refuel his front loader. When he arrived there, he observed a silver-gray Chevrolet LUV pickup truck with orange stripes down the sides and with a distinctive white cap on the top parked in the space where he had to park the front end loader he was driving to fill the tank. Mr. Sears observed a white male with a full beard, about 5′ 8″ to 5′ 10″ tall, hastily leave the cab of the truck, pull the hose from the Finley fuel tank out of the back of the pickup and drive off at a high rate of speed in an easterly direction and then turn north. Because Mr. Sears was low on fuel and the front loader could not go very fast, Mr. Sears radioed the other Finley units, told them what he observed and to be on the lookout for a truck that fit that description.

Joseph A. Galbreath, a Conrail conductor and a brother of Dan Finley Galbreath who owned Finley, heard the radio call of Mr. Sears where he was working at Industrial Plastics Corporation on Mishawaka Road. When Joe got the call, he thought the person driving the truck might try to get out of the Conrail yards the back way so he drove over to the Conrail yards from where he was working which took about four minutes. Joe was on his way to the Finley tank when he saw a truck that fit the description given by Mr. Sears at the Train & Engine (T & E) Building located on the Conrail yards. Joe Galbreath did not see anyone in or around the truck or around the T & E building. He got out of his truck and checked the hood of the Chevy LUV truck. It was hot. He then looked in the back window of the cap on the truck and saw plywood with fresh stains on it and smelled diesel fuel. He did not try to open the truck. Mr. Joe Galbreath then returned to his truck, called Mr. Sears at the Finley fuel tank and told him he had found a truck that fit the description. Joe

Galbreath went to the Finley tank, picked up Mr. Sears and took him back to the T & E building. Mr. Sears identified the truck as the one he had seen at the Finley tank earlier so Joe Galbreath called the train-master at the hump tower on the Conrail radio he had in his truck. Joe told the trainmaster that they had found a truck that fit the description of one seen taking fuel from Finley tank earlier and asked the trainmaster to send the Conrail police to the T & E building. Joe Galbreath and Mr. Sears waited for the Conrail police in Mr. Galbreath's truck and made no further examination of the Chevy LUV truck.

Two Conrail police officers, Howard R. Elliott, Jr. and Stephen R. Oelslager, who were on duty at the Elkhart Conrail yards, received a call at the police office from the trainmaster about 11:00 p.m. on February 2, 1982. The trainmaster told them that there were two Finley people at the T & E building with a truck they believed had been involved in a fuel theft about 20 to 25 minutes earlier that evening at the Finley fuel tank and that they requested that the police go to the T & E building. Officers Elliott and Oelslager went to the T & E building. When they arrived at the T & E building Officer Oelslager, who was the senior acting officer, talked to Mr. Sears who relayed what had occurred that evening. Mr. Sears told him that he was driving a front end loader in the Conrail yards that night and had returned to the Finley tank to refuel where he observed a silver-gray LUV pickup truck with orange stripes down the sides with a white distinctive cap on top that was parked in the space he had to pull the front end loader into to get fuel. Mr. Sears also told Officer Oelslager that he observed a white male with a full beard, 5' 8" to 5' 10" tall hastily leave the cab of the truck, pull the Finley hose from the rear of his pickup truck and drive off at a fast rate of speed in an easterly direction and that he then radioed the other Finley units about the incident. Mr. Sears then gave Officer Oelslager a cap for a fuel tank that he said he had recovered from the nozzle of the hose at the Finley tank. Officer Oelslager asked Mr. Sears if the vehicle found at the T & E building was the one he saw earlier at the Finley tank and Mr. Sears answered affirmatively.

Officer Oelslager then proceeded to inspect the vehicle to obtain a license plate number. He chipped away a couple of handfuls of snow, just enough to read the license numbers which he gave to Officer Elliott. Officer Elliott then ran a check on the license plate number to determine to whom the truck was registered and found out it was registered in the name of Ira William Holdeman and Lois Marie Holdeman. Officer Elliott then called the trainmaster to find out who Ira William Holdeman was.

While Officer Elliott was checking the license plate number from the truck, Officer Oelslager conducted a plain view search of the Chevy LUV pickup truck with a flashlight. He looked in the rear window and observed a piece of plywood laying on top of something, that the plywood had a hole in it and that there appeared to be fuel oil spilled on the plywood around the hole. When Officer Elliott returned from checking the license number, Officer Oelslager then took Mr. Sears back to the police office to get his statement and contact the County Prosecutor's office to get a search warrant while Officer Elliott stayed at the T & E building with the truck.

While Officer Oelslager and Thomas Sears were gone, Joseph Lee Ledbetter and Charles Allen Kern, both general foremen with Conrail at the Elkhart yards and immediate supervisors of Ira William Holdeman, arrived on the scene at the T & E building. Officer Elliott told them about the incident at the Finley fuel tank and that he wanted to check the pickup truck because it fit the description of the truck seen at the Finley fuel tank earlier. Mr. Kern radioed Ira William Holdeman to come to the T & E building at about 11:30. After dropping off some men, Mr. Holdeman went to the T & E building. Officer Elliott told Mr. Holdeman that his truck had been seen at the Finley fuel tank taking fuel, that they had obtained the identification of the owners of the truck, that Officer Oel-

slager and a Finley employee were going to get a search warrant and that he wanted to look in his truck. Mr. Holdeman had no objection to Officer Elliott inspecting the back of his truck and voluntarily opened it. Officer Elliott did not have a search warrant. Mr. Holdeman got his keys and with the assistance of Mr. Kern, got the frozen lock opened in a few minutes. Officer Elliott searched the back of the pickup truck. Underneath the plywood which had a fuel stain on it, Officer Elliott found a fuel tank that was missing a cap. Officer Elliott asked Mr. Holdeman what he had the fuel tank for and Mr. Holdeman said to haul fuel for his brother. When asked where the cap was, Mr. Holdeman replied that he had gotten fuel from his brother earlier that day and had left the cap at his brother's. Mr. Holdeman told Officer Elliott that he could call his brother and would give him the phone number. Officer Elliott read Mr. Holdeman his *Miranda* rights and then Mr. Kern and Mr. Holdeman returned to their work. Officer Elliott called Officer Oelslager to tell him that Mr. Holdeman had come to the T & E building and voluntarily permitted him to look in the back of his truck.

Meanwhile, back at the police office, Officer Oelslager took the statement of Thomas Sears and called the County Prosecutor's Office to get a search warrant. Officer Oelslager had difficulty reaching a prosecutor but finally reached Patrick J. Whisler. Officer Oelslager told Mr. Whisler that he had an eyewitness, Thomas Sears, who had seen a silver-gray Chevy LUV pickup truck with orange stripes and a white distinctive cap parked at the Finley fuel tank located on Conrail property with a hose from the fuel tank place in the back of the pickup truck. He also told Mr. Whisler that Mr. Sears had seen a white male with a full beard, 5' 8" to 5' 10" tall jump out of the truck, remove the hose, get back in the truck and drive away quickly. Officer Oelslager further reported that Mr. Sears had radioed other Finley employees and vehicles in the area and gave them the description of the truck he had observed taking fuel from the Finley tank and that a truck fitting that description had been located on Conrail property and been positively identified by Mr. Sears as the one taking fuel. Officer Oelslager initially requested a search warrant from Mr. Whisler but during the conversation, Officer Oelslager was contacted by Officer Elliott and advised that Ira Williams Holdeman, the owner of the truck, had voluntarily opened the back of the truck and that a large fuel tank with fuel in it had been observed. Officer Elliott further indicated that Mr. Holdeman was a white male of medium height and had a beard. Mr. Whisler could hear Officer Elliott's report to Officer Oelslager. Based on this information, Officer Oelslager asked Mr. Whisler what he should do at that point and Mr. Whisler advised him that he had probable cause for an arrest and that he should proceed to arrest Mr. Holdeman, transport him to the Elkhart County Jail and charge him with felony theft. Officer Oelslager radioed Officer Elliott and told him it was OK to go ahead and arrest Mr. Holdeman. Officer Oelslager took Mr. Sears with him back to the T & E building.

Mr. Holdeman voluntarily returned to the T & E building, Officer Elliott read him his *Miranda* rights and placed him under arrest for theft. When Officer Oelslager arrived at the T & E building with Mr. Sears, Officer Oelslager asked Mr. Sears if Mr. Holdeman was the man he observed at the fuel tank. Mr. Sears said he couldn't be sure. Officer Oelslager gave the fuel cap he had received from Mr. Sears, who had found it at the Finley fuel tank, to Officer Elliott. Officer Elliott checked it for fit with the fuel tank in the back of Mr. Holdeman's truck and it fit perfectly. Officer Elliott removed the cap and gave it back to Officer Oelslager. The officers then placed Mr. Holdeman under arrest and again read him his *Miranda* rights. Officer Oelslager then asked Mr. Holdeman about the fuel cap and Mr. Holdeman replied that it would fit any 55 gallon fuel tank in the yard. Officer Oelslager then asked Mr. Holdeman if that was his fuel cap and Mr. Holdeman elected not to an-

swer. At that point, Mr. Holdeman did not say that he had gotten fuel from his brother that day nor did he ask the police officers to call his brother to verify the fact. Mr. Holdeman then asked the officers if he could remove some personal property from his truck and was given permission to do so. The officers then transferred Mr. Holdeman to the Elkhart County Jail, booked him and then returned to the police office at the Conrail yards to prepare the initial police reports.

The next morning, February 3, 1982, a probable cause hearing was held before the Honorable Donald L. Peterson in the Elkhart County Court, Goshen Division. Judge Peterson found that there was probable cause for the arrest and detention of Ira William Holdeman on the charge of theft, a class D felony. Thereafter, formal charges were filed by the Prosecuting Attorney's office for that offense. Mr. Holdeman was tried on October 4 and 5, 1982, and was acquitted.

On the morning of February 3, 1982, W.M. Ittel, a captain with the Conrail police and immediate supervisor of Officers Elliott and Oelslager as well as Sergeant John W. Helpin, first learned about Mr. Holdeman's arrest and the incidents surrounding said arrest. Captain Ittel personally conducted no investigation relating to Mr. Holdeman's case although he did instruct Sergeant Helpin, another Conrail policeman, to take photographs of Mr. Holdeman's truck and the Finley fuel tank located on Conrail property. Captain Ittel also instructed Sergeant Helpin to obtain fuel samples from the tank in the back of Mr. Holdeman's truck and from the Finley fuel tank located on the Conrail yards and to take a statement from Dan Finley Galbreath. Sergeant Helpin took the photographs as directed and obtained the fuel samples and gave them to Captain Ittel. Another Conrail police officer, Dennis Joseph Gough, took the samples to have them tested at Yoder Oil Company. The tests done by Yoder Oil Company showed that both samples were number one fuel oil. No further tests were done on the fuel samples. Sergeant Helpin also took a statement of Daniel Finley Galbreath on the instructions of Captain Ittel regarding authorization for Conrail to act for Finley. The Conrail police thought such authorization was necessary to file a complaint since the property allegedly taken did not belong to Conrail but Finley's authorization was not needed to make the arrest of Mr. Holdeman.

On February 3, 1982, Daniel Finley Galbreath, the owner of Finley, signed a statement at the request of Conrail police who told him the statement was necessary since the fuel oil allegedly taken was the property of Finley although it was located on Conrail property. Dan Finley Galbreath did not prepare the statement but merely signed it at the request of Conrail police for the purpose stated. Mr. Dan Galbreath was not present at the accusation or arrest of Mr. Holdeman nor did he know anything about it until afterwards. He was not present nor did he testify at the Conrail hearing which resulted in Mr. Holdeman's suspension from his job during the pendency of the criminal charges. Mr. Dan Galbreath had no plan for dealing with persons suspected of stealing fuel from the Finley tank located on Conrail property and was not acquainted with the Conrail police officers that played any part in the arrest or investigation related thereto. Mr. Dan Galbreath had no customary plan or agreement with the Conrail police to arrest, search or prosecute any person nor did Dan Galbreath participate directly or indirectly in any joint activity with the Conrail police officers which resulted in the accusation, arrest, search or prosecution of Mr. Holdeman. His actions regarding the events which occurred the night of February 2, 1982 were limited to signing the statement requested by Conrail police and testifying at Mr. Holdeman's criminal trial to two facts: (1) that Finley had a fuel tank located on Conrail property; and (2) Mr. Holdeman was not authorized to remove fuel from that tank.

Joseph Galbreath's actions with regard to the events which occurred on February 2, 1982 were limited to responding to Mr.

Sears' radio report, seeing a vehicle that matched the description given by Mr. Sears and notifying the trainmaster of the suspected theft. Joseph Galbreath did not own any part of Finley and was not an employee of Finley but was merely the brother of Dan Finley Galbreath. Joseph Galbreath did not know the Conrail police on a personal basis nor did he have any contact with the Conrail police before that evening. Joseph Galbreath did not participate in any joint activity with the Conrail police that evening or any other time to accuse, arrest or prosecute Mr. Holdeman. He had no customary plan for dealing with persons suspected of stealing fuel from Finley. Joseph Galbreath did not testify at the Conrail hearing which resulted in Mr. Holdeman's suspension from his job during the pendency of the criminal charges. Joseph Galbreath was present in his truck at the time of the search of Mr. Holdeman's truck as well as his arrest but he did not talk to Mr. Holdeman, did not assist the Conrail police officers in any way with respect to the search or arrest.

The Conrail police officers impounded Mr. Holdeman's truck and had it towed by Moore's Service to a fenced area for safekeeping. When Charles Norman Frye, Jr., the employee of Moore's Service that towed Mr. Holdeman's truck, came to the Conrail yards to get the truck, he cleaned off the license plate very well to see the state and license number on the plate since there were a lot of people from out of state that worked at the Conrail yards and he could not tell what the license number was on Mr. Holdeman's truck when he first got there. The truck had been sitting out all night on February 2 before he picked it up the morning of February 3.

### III.

Section 1983 of Title 42 United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

To be entitled to a recovery of damages under this section, a plaintiff must establish two elements: (1) that he was deprived of a right secured by the Constitution and laws of the United States, and (2) that the defendant or defendants deprived him of that constitutional right under "color of law." *See, e.g., Adickes v. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1352 (7th Cir.1985); *Butler v. Goldblatt Bros., Inc.,* 589 F.2d 323, 326–27 (7th Cir.1978). Mr. Holdeman's claims of constitutional violations are basically based on the Fourth Amendment of the Constitution of the United States for illegal search and seizure and illegal arrest. The defendants in this case are basically comprised of two groups: (1) Conrail police officers, and (2) private individuals allegedly acting in concert with the Conrail police officers. Defendants Howard R. Elliott, Jr., Stephen R. Oelslager, John W. Helpin and W.M. Ittel were all commissioned Conrail police officers pursuant to I.C. § 8–3–17–1. Accordingly, all of their actions with respect to the search, arrest, investigation and prosecution of Mr. Holdeman were done under color of state law. There is no dispute that Mr. Holdeman has shown the under "color of law" element with respect to these four police officers. The same cannot be said, however, about the private individual citizen defendants.

Private parties, to be subject to liability under § 1983, must be jointly engaged with state officials in prohibited action to meet the "under color of law" requirement. A private party, though not a

state official, can be acting under color of law if he is a "willful participant in a joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 435 (7th Cir.1986); *Mark v. Furay*, 769 F.2d 1266, 1272–73 (7th Cir.1985); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir.1985); *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 327 (7th Cir.1978). Thus, private parties can be subject to liability under § 1983 when they engage in a conspiracy with one or more parties who are acting under color of law. In order to establish a conspiracy, i.e. an agreement on a joint course of action in which the private party and the State have a common goal, *see e.g., Gramenos, supra* at 435, a plaintiff must demonstrate that the State officials and private parties somehow reached an understanding to deny plaintiffs their constitutional rights. *Mark v. Furay*, 769 F.2d at 1273; *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d at 1352. Or, stated another way, the plaintiff must present evidence of some concerted effort, scheme or customary plan between the State officials and private parties. *Moore, supra* at 1352.

A conspiracy may be demonstrated by circumstantial evidence. *Id., Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979). However, bare allegations of certain statements by a defendant without any other proof of a conspiracy, are insufficient to sustain a conspiracy claim. *Moore, supra* at 1352. A party cannot merely cry "conspiracy" and throw itself on the mercy of the jury nor can a party resist a summary judgment by pointing to snippets of a deposition when the point of every witness' statement was that there was no agreement and the police exercised independent judgment. *Gramenos, supra* at 436. Fur-

ther, although it is conceivable that a private party could act under color of law by conspiring with a prosecutor or other state officials, *Briscoe v. Lahue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Dennis v. Sparks, supra; Adickes v. S.H. Kress & Co., supra*, the mere furnishing of information by a private party to a law enforcement official, even if the information is false, is not sufficient to constitute joint activity with State officials in prohibited action or to state a claim against a private party under § 1983, *Mark v. Furay, supra* at 1273; *Moore, supra* at 1352; *Butler v. Goldblatt Bros., Inc., supra* at 327. Nor is merely testifying at a trial sufficient to state a § 1983 claim. *Briscoe v. Lahue, supra; Grow v. Fisher*, 523 F.2d 875, 879 (7th Cir.1975).

In this case the plaintiff maintains that he has presented sufficient evidence to show a conspiracy between the private individuals, Dan Finley Galbreath, Joseph Galbreath and Thomas Sears and the Conrail police officers to avoid a summary judgment. The court disagrees. Thomas Sears and Joseph Galbreath gave information to the Conrail police that led to Mr. Holdeman's arrest, information which Mr. Holdeman maintains was false. As stated earlier, however, the mere furnishing of information by a private citizen, even if false, is not sufficient to state a claim under § 1983 against a private party. Nor does the fact that they may have testified at the criminal trial provide any basis for a § 1983 claim. Mr. Holdeman further maintains that Joseph Galbreath's alleged failure to make certain observations the evening of Mr. Holdeman's arrest, his standing by while the police were called in and then cooperating with the police, is evidence of a conspiracy or customary plan. The court does not find this to be probative evidence of any conspiracy to violate Mr. Holdeman's constitutional rights on the night of February 2, 1982. The only evidence pointed to by plaintiff to show Dan Finley Galbreath's alleged participation in a conspiracy is the statement signed by him on February 3, 1982 at the request of Conrail police offi-

cers. This occurred after the search and arrest of Mr. Holdeman and Dan Galbreath did not know anything about the search or arrest until after they occurred. Further, the private citizen defendants testified that they had no customary plan, scheme or agreement with the Conrail police and in fact did not even know the police officers. The plaintiff has presented no evidence to contradict this testimony. There is no evidence of previous arrests by Conrail police at Finley's request. In fact, the Conrail officers testified that this was the first time that they had encountered such a situation, i.e. private property of another allegedly being stolen on Conrail property, and thus were not sure what to do. Thus, the plaintiff has failed to present sufficient probative evidence for a jury to return a verdict for the plaintiff against the private party defendants in this case and summary judgment must therefore be granted in favor of Joseph Galbreath, Dan Finley Galbreath and Thomas Sears on plaintiff's § 1983 claims against them. Summary judgment must also be granted in favor of Finley Excavating Company on those claims because Finley is a private corporation and cannot be held vicariously liable under § 1983 by a respondeat superior theory. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Wellman v. Faulkner,* 715 F.2d 269, 275 (7th Cir.1983); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983); and *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971). The most recent word on this subject in this circuit is *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir. 1986).

Even though this court has found that the private party defendants, Joseph Galbreath, Dan Finley Galbreath, Thomas Sears and Finley Excavating Company, are entitled to summary judgment in this case because the plaintiff has failed to show the "under color of law" requirement with respect to them, the court also finds that those defendants, together with the Conrail policemen named as defendants, are entitled to summary judgment on the ground that none of Mr. Holdeman's constitutional

rights were violated by defendants in this case. *See Mark v. Furay,* 769 F.2d at 1271. Mr. Holdeman maintains that his Fourth Amendment rights to be free from unreasonable searches and seizures was violated when his pickup truck was searched without the Conrail police first obtaining a search warrant and that the search was done without probable cause and that he was not read his *Miranda* rights before the truck was searched. Although there is some dispute about whether Mr. Holdeman was read his *Miranda* rights before his truck was searched, that fact is not material to the disposition of the search issue. The *Miranda* warnings grew out of the Fifth Amendment of the Constitution of the United States, not the Fourth Amendment, and applies to custodial interrogation as it relates to self-incrimination, not to unreasonable searches. *See, e.g., Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *Rodgers v. Lincoln Touring Service, Inc.,* 771 F.2d 194, 199 (7th Cir.1985). Mr. Holdeman's argument that the search violated his constitutional rights because it was done without a search warrant is equally without merit. The undisputed fact is that Mr. Holdeman voluntarily consented to the search of his pickup truck so he cannot now claim a violation of the Fourth Amendment with respect thereto.

In *United States v. Rojas,* 783 F.2d 105, 109 (7th Cir.1986), Judge, now Chief Judge, Bauer stated:

> We look to many factors when determining whether a consent to search is freely and voluntarily given. We look to the age, *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), education, *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), and apparent intelligence of the defendant. *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). We look to whether the defendant was advised of his constitutional rights, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1965), the length of time that the defendant was detained before

consent was obtained, *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940), the repeated and prolonged nature of the request for consent, *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), and the use of physical coercion such as the deprivation of food or sleep. *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). We also look to whether the defendant was in police custody when the consent was obtained, whether the request for consent was "subtly coercive" in form, and whether the defendant could be expected to be in a "vulnerable subjective state." *Schneckloth v. Bustamonte,* 412 U.S. 218, 229, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Rojas also suggests that we look to six factors outlined in LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 8.2, pp. 642–44, to determine whether consent obtained incident to an arrest is voluntarily given: (1) whether the arrest occurred late at night, (2) whether the arrest was made by forcible entry, (4) whether the arrestee was placed in cuffs or otherwise kept in close restraint, (5) whether in a search incident to arrest the police gained custody of a key or similar means of entry to the place desired to be searched, and (6) whether custody was used as leverage in the sense that the arrestee was told he would be released if he gave consent. *See also, United States of America v. Fisher,* 772 F.2d 371 (7th Cir.1985) and *United States of America v. Denney,* 771 F.2d 318 (7th Cir.1985). Under the aforesaid criminal cases from this circuit which follow the Supreme Court's lead in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the aforesaid elements of consent are clearly present here. This record leads solely to that conclusion.

Finally Mr. Holdeman's argument about lack of probable cause is also without merit. The issue of whether there was probable cause for the search is closely related to the lack of a search warrant in this case because: (1) Officer Oelslager was in the process of obtaining a search warrant before Mr. Holdeman's truck was searched; (2) Mr. Holdeman was informed of those efforts, and (3) voluntarily consented to the search without a warrant. Under such circumstances which are undisputed, there is no basis upon which a reasonable jury could find that Mr. Holdeman's constitutional right to be free from unreasonable searches was violated by the defendants in this case so summary judgment must be granted in favor of all defendants on this issue.

With respect to Mr. Holdeman's Fourth Amendment claim for unlawful arrest and seizure, the Seventh Circuit Court of Appeals has consistently held that the existence of probable cause for an arrest totally precludes any § 1983 claim for unlawful arrest, false imprisonment or malicious prosecution regardless of the lack of good faith or malicious motives on the part of the arresting officers. *Williams v. Kobel,* 789 F.2d 463, 470 (7th Cir.1986); *Mark v. Furay,* 769 F.2d at 1269; *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1344 n. 10 (7th Cir.1985); *Terket v. Lund,* 623 F.2d 29, 31 (7th Cir.1980). Thus, if the arresting officers had probable cause on the evening of February 2, 1982 to arrest Mr. Holdeman, then all of his § 1983 claims would be precluded.

Probable cause is determined by "the factual, practical considerations of everyday life upon which reasonable prudent men, not legal technicians, act." *Williams v. Kobel,* 789 F.2d at 468; *Moore v. Marketplace, supra* at 1345. Thus, probable cause is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training. *Williams v. Kobel, supra* at 471. Whether an arrest was valid therefore depends upon whether the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a man of reasonable caution in believing that the suspect had

committed or was committing an offense. *Williams v. Kobel, supra* at 470–71; *Moore v. Marketplace Restaurant, Inc., supra* at 1345; *see also Guenther v. Holmgreen,* 738 F.2d 879, 887 (7th Cir.1984).

Under the Fourth Amendment arrest standard, considerable uncertainty must be tolerated on occasion because of the need to allow police to take affirmative action in ambiguous circumstances *Williams v. Kobel, supra* at 468. Thus, probable cause turns on the exercise of judgment which cannot readily or usefully be reduced to a neat set of rules. *Gramenos v. Jewel, supra* at 438. Further, the Fourth Amendment does not define probable cause as whatever good police practice would require or whatever proves to be necessary to prevail at trial. *Id.* at 440. The police need not automatically interview available witnesses merely for fear that a jury might later require them to pay damages in a § 1983 action. Although good police practice may require such interviews, the Constitution does not require the police to follow the best recommended practices. *Id.* at 442; *see Gramenos, supra* at 439. Thus, when a policeman arrests a person based on information he/she has received from some person, usually a putative victim or eyewitness, whom it seems reasonable to believe is telling the truth and which information, if true, would justify an arrest, the policeman has probable cause and cannot be held liable for a violation of the Constitution merely because later it turns out the witness was not right or was not telling the truth. *Gramenos, supra* at 439; *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 200 (7th Cir.1985); *see McKinney v. George,* 726 F.2d 1183 (7th Cir.1984).

In this case, the two police officers who arrested Mr. Holdeman the night of February 2, 1982 had probable cause to arrest him. They had an eyewitness who reported information which, if true, was sufficient to justify the arrest. In addition, they had a (1) fuel tank that was missing a cap; (2) concealed in the back of a distinctive looking pickup truck identified by eyewitness under a piece of plywood that had a fuel stain on it; (3) a cap found at the scene of the alleged crime fit the concealed fuel tank; and (4) the truck was registered to Mr. Holdeman. This information certainly gave Officers Oelslager and Elliott reason to believe a crime had been committed and Mr. Holdeman certainly possessed the indicia of committing the crime. However, the officers even consulted with the County Prosecutor's office before they arrested Mr. Holdeman and the Prosecutor determined that the officers had probable cause to arrest Mr. Holdeman and should do so. No one can fault them for exercising that type of judgment. Further, there is no evidence that Officers Oelslager and Elliott knew or even had any reason to think that the facts they relayed to the Prosecutor's office were untrue let alone that they intentionally tried to mislead the Prosecutor. *Cf. Mark v. Furay, supra* at 1269; *Whitley v. Seibel,* 613 F.2d 682 (7th Cir.1980, *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982). When the Conrail police officers consulted with the Prosecutor's office, Mr. Sears had not yet indicated that he could not be sure of the identification of Mr. Holdeman. So that fact was not considered by the Prosecutor but not because the Conrail police officers intentionally concealed it. Further, in light of the other facts on which the determination of probable cause was made, this one fact is not sufficient to undermine the probable cause determination. *See Gramenos, supra* at 439. Further, it must also be noted that the state court found probable cause at a hearing held the morning following Mr. Holdeman's arrest. Although such a finding can be used to foreclose a § 1983 action in some circumstances, *see Williams v. Kobel,* 789 F.2d at 470; *Guenther v. Holmgreen,* 738 F.2d 879 (7th Cir.1984), this court does not here need to rest its decision on that premise because the undisputed facts reveal the existence of probable cause. The most the plaintiff has shown is that the Conrail police officers who arrested Mr. Holdeman did not conduct a thorough investigation before the arrest. As noted earlier, however, the Constitution

does not require such perfection. The absence of same cannot form the basis of a violation of a constitutional right. Thus, the plaintiff has failed to present sufficient probative evidence on which a jury could return a verdict for plaintiff on his § 1983 claims in this case.

Furthermore, the record in this case reveals that only two Conrail police officers named as defendants in this case, Officers Oelslager and Elliott, were involved in the search of Mr. Holdeman's truck and Mr. Holdeman's arrest the night of February 2, 1982. The other two named Conrail police officers, W.M. Ittel and John W. Helpin, did not even know anything about those incidents until the following morning and therefore there is no basis for finding § 1983 against them for those incidents. Further, there is no evidence that they engaged in any activities that violated Mr. Holdeman's constitutional rights after his arrest. Accordingly, there is no basis in this record on which a jury could find defendants, Stephen K. Oelslager, Howard R. Elliott, Jr., John W. Helpin or W.M. Ittel liable under § 1983 for violating Mr. Holdeman's constitutional rights. In addition to the plaintiff failing to present sufficient probative evidence upon which a jury could return a verdict for him on his § 1983 claims, the Conrail police officers are shielded from liability under § 1983 by the concept of qualified immunity. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Kompare v. Stein*, 801 F.2d 883, 889–890 (7th Cir.1986); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d at 1342–44.

For the foregoing reasons, summary judgment is GRANTED in favor of Consolidated Rail Corporation, Howard R. Elliott, Jr., Stephen R. Oelslager, John W. Helpin, W.M. Ittel, Finley Excavating Company, Joseph Galbreath and Dan Finley Galbreath and Thomas Edward Sears and against plaintiffs, Ira William Holdeman and Lois Marie Holdeman on all claims asserted by plaintiffs under 42 U.S.C. § 1983. All of plaintiffs' state law pendent claims are hereby DISMISSED WITHOUT PREJUDICE since the court no longer has a valid federal claim pending before it. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *accord, Shlay v. Montgomery*, 802 F.2d 918 (7th Cir. 1986). SO ORDERED.